## HOBART v. HALL et al.

(Circuit Court, D. Minnesota, Fourth Division. August 31, 1909.)

1. NAVIGABLE WATERS (§ 39*)—RIPARIAN RIGHTS—TITLE AND RIGHTS.

Grants by the United States of its public lands bounded on streams or other waters, made without reservation or restriction, are to be construed as to their effect according to the law of the state in which the lands lie.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 239; Dec. Dig. § 39.*]

2. NAVIGABLE WATERS (§ 36*)—LANDS UNDER WATER—OWNERSHIP BY STATE.

Under the law of Minnesota, the state has no proprietary title to the bed of the Mississippi river or other navigable streams or lakes within the state below low-water mark; but such title as it has is sovereign only, held in trust for the protection of the public right of navigation and incapable of alienation.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 184; Dec. Dig. § 36.*]

3. NAVIGABLE WATERS (§§ 37, 42*)—RIPARIAN RIGHTS—TITLE TO LANDS UNDER WATER.

A grantee from the United States of land in Minnesota bounded by a stream navigable in fact, like the Mississippi river, where there is no reservation, takes the absolute title in fee to high-water mark, or at furthest to low-water mark, and also a right or title to the land under water between such boundary and the middle thread of the stream, which is proprietary and exclusive as to all others than the state or the general government, and as to them except as they may exercise their sovereign ownership for protecting or improving the public right of navigation. The riparian owner or his grantee has the exclusive right to reclaim, occupy, and use for any purpose not inconsistent with such public right such land

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

under water or any island or part thereof between his shore line and the middle thread of the stream, whether such island existed at the time of the survey and was omitted therefrom in good faith and without palpable mistake, or was afterward formed by the gradual action of the waters.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. §§ 37, 42.*]

Action by Corinna L. Hobart against P. M. Hall and the City of Minneapolis. Judgment for plaintiff.

The above-entitled cause came on for trial without a jury, a jury having been expressly waived by the parties, on the 2d day of March, A. D. 1909, at the courtroom in the federal building in the city of Minneapolis in said district. The plaintiff appeared by her attorney, Frederick W. Reed, Esq.; the defendants by their attorneys, Frank Healy, Esq., Albert C. Finney, Esq., and Geo. W. Armstrong, Esq.

The court having heard the evidence and arguments of counsel, and having read the briefs filed, and having duly considered the same, and the pleadings herein, now makes and files the following findings of fact and conclusions of law:

### Findings of Fact.

1. That at the time of the commencement of this action plaintiff was, and ever since has been, a resident and citizen of the state of Illinois. That defendant.city of Minneapolis is a municipal corporation, duly organized under the laws of the state of Minnesota. That at the time of the commencement of this action each defendant was, and ever since has been, a citizen of the state of Minnesota, and a resident of the Fourth division of the district of Minnesota. That the amount in controversy herein, exclusive of interest and costs, exceeds the sum of $2,000.

2. That the United States in 1847 duly made a survey of that part of section 15, township 29, range 24, in what is now Hennepin county, state of Minnesota. lying on the easterly side of the Mississippi river, and by patent dated March 24, 1849, and recorded in the office of the register of deeds of Hennepin county, Minn., September 10, 1858, in Book M of Deeds, on page 338, duly conveyed to Pierre Bottineau lot 3 of said section. That in 1853 said United States duly made another survey, completing the survey of said entire section 15 on both sides of said river and including said river. That plats of both of said surveys were duly made and filed. That said Pierre Bottineau thereafter duly platted a portion of said lot 3 as "Bottineau's addition," which plat was duly recorded in the office of the register of deeds of said Hennepin county, in Book A of Plats, on page 4, and in Book 23 of Plats, on page 19. That through mesne conveyances the plaintiff herein, on April 1, 1896, became, and ever since has been, the owner in fee of that part of said Bottineau's addition known as "Boom Landing," and more particularly described as follows, to wit: Commencing at the intersection of the northeasterly line of lot 5 in Auditor's subdivision No. 44 in Hennepin county, Minn., produced, and the northwesterly line of Eighth avenue northeast; thence north, 60 degrees west, to a point 12.66 chains north, 60 degrees west, from the most easterly corner of said lot 5; thence south 14 degrees west to the Mississippi river; thence southerly along said river to said northwesterly line of said Eighth avenue northeast produced; thence northeasterly along said line to the place of beginning, together with all riparian rights in and attached to said premises, between the shore line thereof and the middle thread of said river. That said premises are on the easterly side of the Mississippi river, in the city of Minneapolis, just north of the easterly end of Plymouth avenue bridge, which crosses said river from the westerly end of Eighth avenue northeast to the easterly end of Plymouth avenue.

3. That said plats of said surveys of 1847 and 1853 show said lot 3 meandered on the Mississippi river and, show said river as the boundary thereof on the southwesterly side thereof. That the plat of said Bottineau's addition shows said Boom Landing as bounded on the southwesterly side by the said

river, and said river is the boundary thereof on the southwesterly side thereof.

4. That at the time said surveys in 1847 and 1853 were made and said plats filed there was no island in the Mississippi river between plaintiff's above-described premises and the west shore of said river, and no island was shown on either of said plats.

5. That about the year 1875, or a little prior thereto, there began to appear above the surface of the water in the river opposite plaintiff's premises, at several different points, separated from each other by stretches of water, the island, afterwards known as "Hall's Island," the title and right to the possession of a portion of which is here in controversy. That when this island first began to appear it was, at these several different points, above the surface of the water at ordinary low stages thereof, and at ordinary high stages it was entirely submerged. That by gradual deposits of earth and sand and other material from the water of the river the exposed portions of said island grew gradually in area, extent, and height, so that in a few years the detached portions thereof became connected together in one continuous island, which island showed continuously thereafter above the water at all ordinary stages except extreme high water during the spring freshets. That the growth of said island continued in like manner until the year 1902 (in which year the patent from the state to defendant Hall hereinafter referred to was issued), at which time it was more or less covered with willows, brush, and cottonwood trees, and was about 1½ acres in extent. That this island was formed, by gradual deposits on the bed of the river of earth and sand and other material from the water thereof, at and about a line of boom piers which had been placed in the river at a distance of about 200 feet from plaintiff's shore line, and where the water was about 8 or 10 feet deep, which piers had been put in for the purpose of attaching booms thereto to hold and control logs coming down the river. That said island was formed on the east side of the middle thread of the said Mississippi river, and the main navigable channel of said river has since the formation of said island always been on the west side thereof; said island lying between said main navigable channel and plaintiff's shore line. That the width of the open navigable channel of said river on the west side of said island is about 600 feet, and the depth thereof for a large part of said distance is from 10 to 15 feet. That while said island at the time of its formation as above set forth was, and ever since has been, separated from plaintiff's shore line by the water of the river for a distance of from about 75 to about 200 feet, said water, or channel, if it may be called a "channel," varying in width at different points between said limits, the bottom of said channel has been gradually filling up with earth and sand and other material from the water of the river, so that the depth of the water therein was, at times of ordinary low water, in the year 1902 and for some years prior thereto, only about 2 feet at any point from the shore of the island to the shore of the mainland at the shallowest part thereof, and about from 3 to 5 or 6 feet at the deepest part thereof, and in the year 1908 only from about 1½ to about 2 feet at the shallowest part, and from about 3 to 4 feet at the deepest part, except where the same had been artificially deepened.

6. That in the year 1902 the auditor, or land commissioner, of the state of Minnesota, caused a survey to be made of said island, and thereafter, on the 13th day of November, 1902, there was, for a valuable consideration, issued to defendant Hall a patent from the state of Minnesota purporting to convey said island to said defendant Hall as swamp land; said island being described in said patent as lot No. 9 of the state subdivision of section 15, in township 29 north of range No. 24 west of the Fourth principal meridian, containing .80 of an acre, more or less, according to state survey, and situated in the county of Hennepin and state of Minnesota according to the official plats of the surveys of the said lands, on file in the state land office, which patent was duly recorded in the office of the commissioner of state lands in Patent Record A, Swamp Land, on page 1, and in the office of the register of deeds of Hennepin county, Minn., in Book 575 of Deeds, p. 15. That no patent from the United States to the state of Minnesota was ever issued for said island, nor was there ever any swamp land selection list of lands filed showing said island.

7. That thereafter, on the 14th day of November, 1902, the defendant P. M. Hall and Anna C. Hall, his wife, for a valuable consideration, duly made, exe-

cuted, and delivered to the defendant city of Minneapolis a deed purporting to convey said island to said defendant city of Minneapolis, in trust, however, as expressed in said deed, "for the use and purpose, and upon the terms, conditions, reservations, and agreements herein set forth and declared, to wit: For the location and operation of a public crematory for the destruction of garbage, refuse, and other waste matter of the city of Minneapolis. And if at any time hereafter said premises shall not be, or shall cease to be used for the purpose above specified, or are diverted to other uses and purposes, then and in that event said premises and all additions, extensions, and accretions thereto shall revert to, and shall be and become the property of the grantors herein, and of their heirs and assigns"—which said deed was duly recorded in the office of the register of deeds of Hennepin county, Minn., on the 27th day of November, 1903, in Book 575 of Deeds, p. 16. That thereafter, on the 4th day of June, 1906, said defendant P. M. Hall and Anna C. Hall, his wife, for a valuable consideration, duly made, executed, and delivered to the defendant city of Minneapolis another deed purporting to convey said island to the said defendant city of Minneapolis, in trust, however, as expressed in said deed, "for the uses and purposes, and upon the terms, conditions, and agreements herein set forth and declared, to wit: For public municipal purposes only. And if at any time hereafter said premises shall cease to be used for public municipal purposes, or are diverted to other uses and purposes, then and in that event, said premises and all additions, extensions, and accretions thereto shall revert to, and shall be and become the property of the grantors herein and of their heirs and assigns"—which said deed was duly recorded in the office of the register of deeds in and for Hennepin county, Minn., on the 24th day of November, 1906, in Book 615 of Deeds, p. 488.

8. That thereafter the defendant city of Minneapolis took possession of said island and made and constructed large and valuable improvements thereon, using the same as a public park, and the channel on the east side thereof as a public swimming pool in the summer months, and as a public skating rink in the winter months.

9. That on November 26, 1903, and before said defendant city of Minneapolis had taken possession of the said island and made the said improvements thereon, plaintiff caused a written notice to be duly served on defendant city of Minneapolis, which is in words and figures following, to wit:

"To the Honorable the City Council of the City of Minneapolis:

"Notice is hereby given: That Corinna L. Hobart is the owner in fee and in actual possession of the following described premises situated in the city of Minneapolis, Hennepin county, Minnesota, to wit: Commencing at the intersection of northeasterly line lot 5, Auditor's subdivision No. 44, Hennepin county, Minnesota, produced, and the northwesterly line of Eighth avenue northeast; thence north 60 degrees west, to a point 12.61 chains north, 60 degrees west, from most easterly corner of said lot 5; thence south 14 degrees west, to Mississippi river; thence southerly along river to northwesterly line of said Eighth avenue northeast; thence northeasterly to beginning, section 15, township 29, range 24. And that said Corinna L. Hobart, by virtue of her ownership of said tract of land and of the riparian rights incident thereto claims title to and right to the exclusive possession of all accretions to said tract formed along the bank or shore of said river, whether contiguous to said tract or detached therefrom, and whether a part of the mainland or islands adjacent thereto, lying and being between said tract and the main navigable channel of the river, and included between the lines extending out to the middle thread thereof respectively from the most northerly and southerly points of, said tract on the bank or shore of said river at right angles to said shore. And whereas, said Corinna L. Hobart is informed and believes that the city of Minneapolis claims some right or interest in or title to a portion of the premises above described, to wit, the island commonly known as "Hall's Island," a large portion of which is included between the lines defining the premises claimed by said Corinna L. Hobart as above set forth; and that said city of Minneapolis proposes to take possession thereof and appropriate the same to its own use, thus trespassing upon and violating the said rights of said Corinna L. Hobart therein: Now, therefore, notice is hereby given that said Corinna L. Hobart claims title to and the right to the exclusive possession of

all that portion of said island included within the lines as above set forth, and that she will hold the said city of Minneapolis liable for any infringement of or interference with her rights in said island.

"Corinna L. Hobart, by W. H. Bennett, Her Attorney.
"Dated November 26, 1903.
"Koon, Whelan & Bennett and R. D. Taylor, Attorneys and of Counsel for Corinna L. Hobart."

10. That after said notice was so served upon defendant city of Minneapolis it was by said defendant city turned over to said defendant P. M. Hall, who was the then health officer of said city, and from and after said November 26, 1903, both defendants had full notice and knowledge of the rights and title which said plaintiff then claimed, and in this action claims, in said island.

### Conclusions of Law.

1. That the plaintiff is the owner in fee simple absolute and entitled to the immediate possession of all that portion of lot 3 in section 15, township 29, range 24, Hennepin county, Minn., commonly known as "Boom Landing," lying north of Eighth avenue northeast in the city of Minneapolis, Minn., as shown on the plat of Bottineau's addition on record in the office of the register of deeds of said county, and more particularly described as follows: Commencing at the intersection of the northeasterly line of lot 5 in Auditor's subdivision No. 44 in Hennepin county, Minn., produced, and the northwesterly line of Eighth avenue northeast; thence north 60 degrees west to a point 12.66 chains north 60 degrees west from the most easterly corner of said lot 5; thence south 14 degrees west to the Mississippi river; thence southerly along said river to said northeasterly line of said Eighth avenue northeast produced; thence northeasterly along said line to the place of beginning.

2. That as such riparian owner plaintiff is the beneficial owner, and entitled to the immediate and exclusive possession and use (subject only to the paramount right and title of the state therein, or of the general government, for the purpose of protecting, preserving, and improving the public right of navigation on said river) of all that part of that certain island, known as "Hall's Island," in said river, which lies between the shore line of said above-described premises and the middle thread of said river, and between two lines drawn perpendicularly to said thread, one at the northerly and one at the southerly end of the shore line of said premises, and is therefore, as against the defendants herein, entitled to the immediate possession of said portion of said island.

3. That plaintiff is entitled to recover from defendants herein her costs and disbursements herein.

Let judgment be entered accordingly.

Frederick W. Reed, for plaintiff.

Frank Healy, Albert C. Finney, and Geo. W. Armstrong, for defendants.

MORRIS, District Judge. The question involved in this case is the right to the possession of a portion of a small island which has arisen from the bed of the Mississippi river, having been formed by gradual deposits from the water of the river subsequent to the government survey and subsequent to the issue of the patent to plaintiff's shore land. The plaintiff bases her claim to such right upon her title, derived under patent from the government and through mesne conveyances, to the land on the shore of the river opposite to which the island has been formed; the island being between the shore line and the main navigable channel of the stream. The defendant city of Minneapolis bases its claim to such right upon a patent to the island issued by the state of Minnesota, after a survey of the island by direction of the state auditor, or land commissioner, to the defendant Hall, and a deed from defendant Hall to it. The city of Minne-

apolis further contends that, even if the patent to Hall conveyed no title, still the plaintiff has no title or right of possession, and the court should leave the parties as it finds them.

Questions which might arise in this connection either by reason of gradual changes in the main navigable channel of the river, or by avulsion, are not here involved and need not be considered.

This island having risen from the bed of the stream by gradual deposits of the river, and having been at all times separated from the shore by the water of the river, it would seem to be too clear for argument that the character and extent of the title, either of the state or of the riparian owner, to such an island, must depend upon and follow the character and extent of their title to the bed of the stream on which it has been formed. If it should be found that the state has no proprietary right or title in the bed of a navigable stream, and consequently in islands arising therefrom which it can alienate, but that whatever right or title it has it holds in its sovereign capacity, as trustee for the people, for public use, and that therefore the state has no right or title in this island which it could convey to a private party, and that for that reason the defendants herein have no right or title thereto, yet this would not be decisive of the case, for the plaintiff cannot recover upon the weakness of the defendants' title, but must recover upon the strength of her own. If the plaintiff has no title or right of possession to this island, whatever may be the rights of the defendants, she cannot recover in this action.

It is now well settled beyond controversy, both by the decisions of the Supreme Court of the United States and by the decisions of the Supreme Court of the state of Minnesota, that grants by the United States of its public lands bounded on streams or other waters, made without reservation or restriction, are to be construed as to their effect according to the law of the state in which the lands lie. Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541; Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; and other cases. So that the declarations of text-book writers and the decisions of other states will be of little assistance here, and a proper solution of this controversy must be found, if possible, in the decisions of the Supreme Court of Minnesota. The question therefore is: What right or title have the state and a riparian proprietor, respectively, in this state, under the decisions of its highest court, to the bed of a stream, above the flow of the tide, but navigable in fact, like the Mississippi river, or any island formed thereon, between the shore line of the riparian proprietor and the middle thread of the main navigable channel of the stream?

While this question has been clearly, fully, and finally decided, in decisions which are wholly irreconcilable, by the Supreme Courts of certain of the states, as for instance, of the states of Illinois and Mississippi and of the states of Iowa and Missouri, the former holding that the ownership in fee of the bed of the stream to the middle thread thereof is in the riparian proprietor, subject to the public easement, and the latter that the ownership of the riparian proprie-

tor stops at the water's edge, and that the full, complete, and absolute ownership in fee of the bed is in the state (Hardin v. Jordan, supra), the decisions bearing upon it in Minnesota are not altogether clear and satisfactory, but are somewhat confusing. I think, however, that the error into which the court fell in St. Paul, etc., R. Co. v. First Division, etc., R. Co., hereinafter cited, in its interpretation of the decisions of the Supreme Court of the United States in Railroad Co. v. Schurmeier, 7 Wall. 272, 19 L. Ed. 74, as to that court's construction of the United States statutes in reference to the survey and sale of the public lands, and the limitations imposed thereby in grants of the government in patents to lands upon navigable streams (Lamprey v. State, supra), has for a long time dwelt with it, and has, to some extent at least, produced the seeming confusion; and, bearing this in mind, I think I have been able to determine correctly from its decisions what the definite and final holding of the court is.

In Schurmeier v. St. Paul & Pac. R. Co., 10 Minn. 82 (Gil. 59), 88 Am. Dec. 59, the first case in which the question here under consideration was discussed, the action was brought to enjoin the defendants from constructing and using a railroad along the levee, or landing, on the Mississippi river in the city of St. Paul in front of lots of the plaintiff, fronting, according to the plat of said city, on said levee, or landing. In 1849 Lewis Roberts purchased and received from the government a patent for certain government subdivisions fronting on the Mississippi river and platted the same as the town of St. Paul; plaintiff's town lots being a part of said plat and of said government subdivisions. The plat extended to the main channel of the river. A strip of land along the Mississippi river, extending to the main channel, was designated on the plat as "Landing." The government survey of these subdivisions was made and the map thereof filed in 1847. The map of the survey did not indicate the existence of any island in the river opposite the lot in which plaintiff's premises were situated, but showed a clear, open river. There was, in fact, in the river opposite said lot, and outside of the meander line of the bank of the Mississippi river, as shown by said map, a small island, which in high water was covered with water. At a medium stage of the water the island was above water, and between it and the mainland there was a current, or flow of water. At low water there was no current and very little water; such as there was standing in pools. In 1856 the government caused this island to be surveyed and designated on the map, "Island No. 11." Prior to this the city of St. Paul had established the grade for and graded the levee so as to include the island, filling in between it and the mainland. The plaintiff, who derived title from Roberts to his town lots, which fronted on the levee, constructed a warehouse on them, according to the grade of the levee as so established. The defendant railroad company, claiming under Act Cong. March 3, 1857, c. 99, 11 Stat. 195, granting lands to the territory of Minnesota to aid in the construction of certain railroads therein, and so forth, and Act Cong. Aug. 4, 1852, c. 80, 10 Stat. 28, to grant right of way to rail and plank roads through public lands of the United States, and other acts of Congress, and

of the territorial and state Legislatures, to carry such acts of Congress into effect, entered in 1862 upon that part of the levee which included said island and the space between it and the mainland, to construct along the same its railroad tracks, raising the grade for that purpose so as to obstruct plaintiff's use of his warehouse in connection with the river. The case was tried before a referee, and judgment rendered enjoining the defendants as prayed in the complaint, and that judgment, on appeal to the Supreme Court of the state of Minnesota, was affirmed.

The court, after referring to the meander line, and the contention (which is. not made or involved here) that it, and not the river, was the boundary of the government subdivisions, and holding that in .such a case as the one there presented there is no such thing as a meander line separate and distinct from the line of the river, and that the meander line is not a boundary, but that the water whose body is meandered is the true boundary, whether the meander line in fact coincides with the shore or not, says:

"We think therefore that it is too clear to admit of a reasonable doubt that the river bounds this lot on one side. But this being admitted, the further question is presented whether the riparian owner takes to high-water or low-water mark, or to the middle thread of the stream. At common law, grants of land bounded on rivers above tide water carry the exclusive right and title of the grantee to the middle thread of the stream, unless an intention on the part of the grantor to stop at the edge or margin is in some manner clearly indicated, except that rivers navigable in fact are public highways, and the riparian proprietor holds subject to the public easement. In this case no intention is in any way indicated to limit the grant to the water's edge, and if the common-law rule prevails here, Roberts, by his purchase, took to the center of the river, including the land subsequently surveyed by the government, called 'Island No. 11,' and which is now claimed by the defendants. The common law of England, so far as it is applicable to our situation and government, is the law of this country in all cases in which it has not been altered or rejected by statute, or varied by local usage under the sanction of judicial decisions.

"We think, in respect to the rights of riparian owners, it is as applicable to the circumstances of the people in this country as in England. It is not true in fact, as has been alleged, that the navigability in fact of a river above the flowing of the tide is a state of things unknown to or unprovided for by it. See Hale, Treatise De Jure Maris, etc., pt. 1, c. 3. In its application to cases like the one under consideration it has not been varied or rejected in this state, and the few states of the Union that have repudiated it are exceptions to the general rule. (See cases cited.)

"Some—we believe most—of the authorities that deny that the riparian proprietor owns to the middle thread of the stream hold that he takes to the low-water mark. (Citing cases.) This we think would include the land claimed by the defendant, and designated 'Island No. 11.' We hold therefore that by the patent to Roberts the United States conveyed to him said 'island.'

"We think no reason can be given why the same rule should not apply to grants made by the government that are applicable to grants made by individuals. Section 9 of the act of Congress first above cited provides that all navigable rivers within the territory to be disposed of by virtue of that act shall be deemed 'to be and remain public highways.' At common law rivers navigable in fact are public highways, and the riparian owner holds subject to the public easement. This act of Congress therefore is merely a declaration or affirmance of the common law, and not a modification of it. The fact that these rivers are, and must remain, public highways, is not at all inconsistent with the view that riparian owners have the fee of the bed of the stream. Peck v. Smith, 1 Conn. 133 [6 Am. Dec. 216]."

The remaining portion of the opinion relates to a question not here involved.

It will be noticed that, while the holding of the court really was that the riparian proprietor of land bounded on one side by the Mississippi river takes the complete and absolute fee at least to the low-water mark, and that the land in dispute in that case, designated "Island No. 11," was included within such boundary, yet the very learned Chief Justice here declares, in clear and unmistakable language, that the navigability in fact of a river above the flowing of the tide is not a state of things unknown to or unprovided for by the common law, that under that law the riparian owner holds the fee to the middle thread of the stream, subject to the public easement, that in respect to the rights of riparian owners that law is as applicable to the circumstances of the people in this country as in England, and, by unavoidable inference, that it is the law of this state.

In Rippe v. Chicago, D. & M. R. Co., 23 Minn. 18, the court says:

"Conceding that these lots abutted on the Mississippi river, a legally-declared public highway, there can be no question but that their owner possessed the riparian right of constructing thereon suitable landings and wharves for the convenience of commerce and navigation (Dutton v. Strong, 1 Black, 23 [17 L. Ed. 29]; Railroad Co. v. Schurmeier, 7 Wall. 272 [19 L. Ed. 74]), and to extend such construction out into the river to the point of navigability (Dutton v. Strong, 1 Black, 23 [17 L. Ed. 29])."

In Brisbine v. Railroad Co., 23 Minn. 114, the court holds that the owner of a piece of land bordering on the Mississippi river, purchased from the United States, and comprising a block of land in a city, and a narrow strip between such block and the river, continues to be a riparian proprietor, though such strip has become a public street by a common-law dedication, and that, even after he has conveyed such block, describing it in his deed as extending to the street, he continues to be a riparian proprietor in respect of his ownership of the fee of that half of the street between the center thereof and the river, and that the absolute title in fee to all the land between the center line of the said street and the river at low-water mark undoubtedly remains in the plaintiff, together with all such riparian rights as follow the ownership of real estate bordering upon a navigable stream. As to these rights, the court says, at page 129:

"What these rights are, especially in regard to land acquired originally from the United States, and bordering, as this does, upon the Mississippi river, we regard as fully and correctly settled by the federal Supreme Court. Dutton v. Strong, 1 Black. 23 [17 L. Ed. 29]; Railroad Co. v. Schurmeier, 7 Wall. 272 [19 L. Ed. 74]; Yates v. Milwaukee, 10 Wall. 497 [19 L. Ed. 984]. According to the doctrine of these decisions, the plaintiff possessed the right to enjoy free communication between his abutting premises and the navigable channel of the river, to build and maintain, for his own and the public use, suitable landing places, wharves, and piers, on and in front of his land, and to extend the same therefrom into the river, to the point of navigability, even though beyond low-water mark, and to this extent exclusively to occupy, for such and like purposes, the bed of the stream, subordinate and subject only to the navigable rights of the public, and such needful rules and regulations for their protection as may be prescribed by competent legislative authority. The rights which thus belong to him, as riparian owner of the abutting premises, were valuable property rights, of which he could not be divested without consent, except by due process of law, and, if for public purposes,

upon just compensation. Yates v. Milwaukee, 10 Wall. 497 [19 L. Ed. 984].

"If, as is claimed by the defendant, Water street was in fact a street lawfully dedicated to public use as such, whatever its actual width—whether occupying the whole or only part of the intervening space between the block and the river—the fee of the south or river side half thereof remained in the plaintiff, subject only to the specific easement created by the act of dedication. Banks v. Ogden, 2 Wall. 57 [17 L. Ed. 818]. No additional servitude could be imposed upon it against his will, except for some public purpose, and upon compensation as provided by law. The company had no right to occupy it for the purposes of its road, nor could it acquire any such right from the city of St. Paul. Gray v. First Div. St. Paul & Pacific R. Co., 13 Minn. 315 [Gil. 289]; Schurmeier v. St. Paul & Pac. R. Co., 10 Minn 82 [Gil. 59, 88 Am. Dec. 59]. Being such owner in fee of this half of the street, even though no soil was left remaining between it and the river at low-water mark, he was a riparian proprietor of land bounded by a navigable stream, and certainly possessed of all the rights appurtenant to such ownership. Banks v. Ogden, 2 Wall. 57 [17 L. Ed. 818]; Yates v. Milwaukee, 10 Wall. 497 [19 L. Ed. 984]."

But in the case of In re Minnetonka Lake Improvement Company, 56 Minn. 513, at page 520, 58 N. W. 295, 296, 45 Am. St. Rep. 494, the court says:

"While the title of a riparian owner on navigable or public waters extends to ordinary low-water mark, yet it is unquestionably true that his title is not absolute, except to ordinary high-water mark. As to the intervening space, the title of the riparian owner is qualified or limited by the public right. The state may not only use it for purposes connected with navigation without compensation, but may protect it from any use of it, even by the owner of the land, that would interfere with navigation."

So that it would now appear that under Minnesota decisions the absolute title in fee of the riparian owner extends only to ordinary high-water mark.

In St. Paul, etc., Ry. Co. v. First Division, etc., R. Co., 26 Minn. 31, 49 N. W. 303, the court says:

"The controversy in this case is concerning the title to a strip of land lying along the northerly shore of the Mississippi river at St. Paul, and opposite lot 1, section 5, town 28, range 22, and lots 3 and 4, section 32, town 29, range 22. Lot 1 was conveyed by patent to Louis Robert, March 24, 1849, and lots 3 and 4 to Norman W. Kittson, the same date. The surveys were made in 1848, and approved, and the official plats of the townships were, of course, at the date of the patents, on file in the land office of the district. In 1852 the strip in question was, pursuant to instructions from the General Land Office, surveyed as an island, and inserted upon the plats as lot 3, section 5, and lot 5 of section 32 above, and April 7, 1855, was conveyed by patent to John M. Lamb. Under the latter, this plaintiff claims title; the defendants under Robert and Kittson. Lot 1, section 5, and lots 3 and 4, section 32, abut, according to the official plat, on the river. The plaintiff claims, as a fact, that at the date of the patents to Robert and Kittson the strip in controversy was an island, surrounded at all stages of water by the waters of the river, with a channel and current between it and the main shore. The defendants claim, as a fact, that it was then a part of the main shore, although in high water entirely, and in medium and low water partly, separated from it by a slough, into which the waters of the river flowed. As a question of law, the defendants claim that the rule of the common law that the grantee, in a grant bounded generally upon a nonnavigable stream, takes to the middle of the stream, is in this state applicable to the Mississippi river and its tributaries, they being 'nonnavigable' in the common-law sense of the term as applied in the construction of grants, and that this rule controls in the construction of patents of the public lands issued by the general government, as well as to conveyances between private persons. The plaintiff claims that

the patentee of a governmental subdivision, bordering on a stream navigable in fact, takes only to the meandered line, or, at most, that he takes only to low-water mark. On the trial below, the parties having given evidence of their respective claims as to the fact, and rested, the court held that the patentees, Robert and Kittson, took, under their patents, to the middle line of the river, and directed a verdict for the defendants. From an order denying a new trial, this appeal is taken.

"This court, in Schurmeier v. St. Paul & Pacific R. Co., 10 Minn. 82 [Gil. 59, 88 Am. Dec. 59], decided that the meander lines of governmental subdivisions, bordering on navigable rivers, do not limit the grant in a patent; and this decision was affirmed by the Supreme Court of the United States in the same case. Railroad Co. v. Schurmeier, 7 Wall. 272 [19 L. Ed. 74]. The question is therefore set at rest. In the same case, this court held that the common-law rule as to the construction of grants of land bordering on streams is in force in this state, and is applicable to patents or grants of the public lands by the general government. But patents and grants by the general government may be controlled in this respect, as in others, by the acts of Congress regulating the survey and sale of the public lands; and, in the case we have cited, the Supreme Court of the United States decided that, under the various acts of Congress providing for the survey and sale of the public lands, the title of the patentee of lands bordering on streams navigable in fact stops at the stream, and that the title to the beds of such streams is reserved to the government. This, being a construction of statutes of the United States by the court of last resort, is binding, and settles the rule applicable to patents of the public lands by the general government, issued pursuant to the statutes referred to. The court below was therefore wrong in its reason for directing a verdict.

"It remains to be considered whether, aside from this reason, the defendants were entitled to a verdict. The record contains copies of the official plats of section 5, town 28, and section 32, town 29. Upon these plats the Mississippi river through or opposite these sections is delineated. The plats show no island in that part of the river, no land between which and the mainland any channel runs. From them it appears that the lots granted to Robert and Kittson extend to the body of the river, the main stream. By the survey, as shown on the plats, the strip in question was surveyed, not as an island, but a part of the mainland, and included in those lots. After the government has sold lands according to a survey and plat, it cannot (as a general rule, at least) dispute the truth of such survey and plat. Bates v. Illinois Central R. Co., 1 Black. 204 [17 L. Ed. 158]; Lindsey v. Hawes, 2 Black. 554 [17 L. Ed. 265]; Railroad Co. v. Schurmeier, 7 Wall. 272 [19 L. Ed. 74]. If there can be any case in which, after a sale of the lands, the government may question the accuracy of the survey and plat by which it sold, it is not such a case as this.

"There is nothing to call in question the good faith towards the government of the surveyors who made the first survey. The testimony makes it doubtful whether, at the time of that survey, the strip in controversy was an island or part of the mainland. In such case, the surveyors may determine, to the best of their judgment, whether such strip should be surveyed as an island or a part of the mainland; and if their survey is approved, and the land sold according to it, the government is bound by their action. This being so, the title to the strip in question passed under the patents to Robert and Kittson, and, as a consequence, the subsequent survey and platting of it as an island was unauthorized, and the patent issued to Lamb, pursuant to it, passed no title. For the same reason, the proceedings of the officers of the land office, upon Lamb's application to pre-empt under the subsequent survey, which plaintiff offered to prove, were null. Those officers could have no jurisdiction to determine anything in relation to lands which the United States had already conveyed."

It will be noted that the court here says that it held, in the Schurmeier Case, that the common-law rule as to the construction of grants of land bordering on streams is in force in this state, and is applicable

to patents or grants of the public lands by the general government. But it here assumes (and here is the error heretofore referred to) that the Supreme Court of the United States had construed the acts of Congress regulating the survey and sale of the public lands as restricting the title of the patentee of lands bordering on streams navigable in fact to the edge of the stream, and had held that by virtue of those acts the title to the beds of such streams is reserved to the government. But not only has the Supreme Court of the United States repudiated any such construction of the acts of Congress, and the holding resulting therefrom as supposed by the Minnesota Supreme Court (Barney v. Keokuk, supra; Hardin v. Jordan, supra), but the Supreme Court of Minnesota has also repudiated it (Lamprey v. State, supra). So that it would now seem that, if Judge Wilson was correct in his statement of the common-law rule in the Schurmeier Case, the trial court in this case was right, not only in its conclusion, but in the reason it gave therefor.

It is difficult to tell from the opinion (the paper book is not at hand) whether the strip or island there in controversy was within or outside of the meander line as surveyed by the government surveyor, and whether or not the court meant to hold that, where there is a small island in the river opposite the shore land and between it and the middle thread of the main channel of the river, which the surveyor might, and did, in good faith, omit from the survey, deeming it so inconsiderable (a negligible fraction) that it was unnecessary to survey it, the island would be considered a part of the mainland and included in the survey thereof, and would pass by the grant in the patent to the owner of the shore lying opposite to it by virtue of his riparian ownership and as appurtenant thereto; but it would seem from the dissenting opinion by Judge Berry that this was intended to be the holding. And if it be the law in this state that such small unsurveyed island, existing at the time of the survey and situated between the shore and the middle thread of the main channel of the river, would pass to and be the property of the patentee of the adjacent shore land by virtue of this riparian proprietorship, the question at once suggests itself: Would not an island formed subsequent to the survey by deposits of the stream in a similar locality become his property by virtue of such proprietorship? In the latter case at least, however, it would seem, from the doctrine announced by Judge Wilson in the Schurmeier Case, and from what has been said by the court in subsequent cases, that his ownership would be subject to the public easement; that is, subordinate and subject only to the navigable rights of the public, and such action as might be taken, or such needful rules and regulations as might be prescribed, by the state, or by the general government if the stream could be used for purposes of interstate commerce, by competent legislative authority, for the protection, preservation, and improvement of such rights. Brisbine v. Railroad Co., supra.

In the case of Morrill v. St. Anthony Falls Water Power Co., 26 Minn. 222, 2 N. W. 842, 37 Am. Rep. 399, the only question involved was as to the uses which a riparian owner may make of the water of the stream flowing past his land. That question is not involved here.

but there are certain portions of the opinion which bear upon the question here. At page 228 of 26 Minn., page 846 of 2 N. W. (37 Am. Rep. 399), the court says:

"Dutton v. Strong, 1 Black, 23 [17 L. Ed. 29], affirmed the right of a riparian owner on a navigable lake to build and maintain, for his own exclusive use and benefit, a pier into the lake as far as the point of navigability. The right to encroach upon the shallow water of the lake, by an exclusive appropriation even of the underlying soil, must rest upon the proposition that the riparian owner may make any use of the lake or river opposite his land not inconsistent with the public right.

"As it seems to us, none of these opinions state the right too strongly. If the right exists jure naturæ, because the land has, by nature, the advantage of being washed by the stream, it is impossible to see how any such distinction as defendant claims can be made as to the peculiar uses which the riparian owner may make of the waters. The limit to the private right is imposed by the public right, and the private right exists up to the point beyond which it would be inconsistent with the public right.

"It is now settled by the decisions of the court of last resort that, under the acts of Congress providing for the survey and sale of the public lands, the patentees of lands bordering on the Mississippi river and its tributaries take only to the stream—at farthest, to low-water mark—leaving the title to the bed of the stream below low-water mark in the government. Those streams, below low-water mark, stand therefore, in respect to the rights of the government and individuals in them, the same as tidal rivers. The rights of riparian owners are the same in both."

It will be noticed that the error above referred to, into which the court fell in St. Paul, etc., R. Co. v. First Division, etc., R. Co., supra, still remains with it in the clause above quoted, wherein it declares that it is now settled by the decisions of the court of last resort that, under the acts of Congress providing for the survey and sale of the public lands, the patentees of lands bordering on the Mississippi river and its tributaries take only to the stream—at farthest, to low-water mark— etc., and that the right of riparian owners are the same in both tidal and nontidal rivers. It will be well also to note here (because it has been repeated with approval by the court in Hanford v. St. Paul & Duluth R. Co., hereinafter referred to) the declaration of the court that the right of the riparian owner to encroach upon the shallow water, by an exclusive appropriation even of the underlying soil, must rest upon the proposition that the riparian owner may make any use of the river opposite his land not inconsistent with the public right, that the limit to the private right is imposed by the public right, and the private right exists up to the point beyond which it would be inconsistent with the public right.

In Union Depot, etc., Co. v. Brunswick et al., 31 Minn. 297, at page 301, 17 N. W. 626, at page 628, 47 Am. Rep. 789, the court says:

"In this state it is the settled doctrine that the riparian owner has the fee to low-water mark. Schurmeier v. St. Paul & Pac. R. Co., 10 Minn. 82 [Gil. 59, 88 Am. Dec. 59]; Brisbine v. St. Paul & Sioux City R. Co., 23 Minn. 114. But while he only has the fee to low-water mark, he has certain riparian rights incident to the ownership of real estate bordering upon a navigable stream. Among these are the right to enjoy free communication between his abutting premises and the navigable channel of the river, to build and maintain suitable landings, piers, and wharves, on and in front of his land, and to extend the same therefrom into the river to the point of navigability, even beyond low-water mark, and, to this extent, exclusively to occupy for such

and like purposes the bed of the stream, subordinate only to the paramount public right of navigation. Dutton v. Strong, 1 Black, 23 [17 L. Ed. 29]; Railroad Co. v. Schurmeier, 7 Wall. 272 [19 L. Ed. 74]; Yates v. Milwaukee, 10 Wall. 497 [19 L. Ed. 984], supra; Rippe v. Chicago, D. & M. R. Co., 23 Minn. 18; Brisbine v. St. Paul & Sioux City R. Co., supra. These riparian rights are property, and cannot be taken away without paying just compensation therefor. The state could not do it or authorize any one else to do it. Yates v. Milwaukee, supra; Lyon v. Fishmongers' Co., L. R. 1 App. Cas. 662; Brisbine v. St. Paul & Sioux City R. Co., supra.

"The term 'point of navigability,' as used in the cases referred to, is not, perhaps, capable of a fixed definition. Its meaning and application must vary with and depend upon circumstances. It is not to be understood in the narrow sense of being limited to that point where the waters of the stream may be navigable for some purposes at certain stages of water. When it is said that a riparian owner may construct landings, etc., 'to the point of navigability,' it must be understood as giving him the right to do so to the extent necessary to make his abutting property reasonably available at any ordinary stage of water for any kind of navigation for which the stream is used, and for which it is adapted, provided, of course, it does not obstruct the paramount rights of the public. It must have reference not only to an ordinarily low stage of water, but also the size and kind of vessels which navigate the stream, and the kind of business done upon it. The right would be of little value if it did not permit this to be done. Neither is it material whether, in exercising these riparian rights, the property is made available and useful by building piers and landings of wood or other material, or, as is the usual, and often the only practical, way on the Mississippi and its tributaries, by reclaiming the land by artificial filling with earth out to the requisite depth of water. Whether the fee in this 'made land' would be in the state or in the riparian owner—that is, whether it partakes of the nature of the bed of the stream upon which it is made, or of the shore to which it is added—may be a question of speculative interest; but it is not one of any practical importance. If the fee be in the riparian owner, yet, of course, it must be a qualified fee; that is, subject to the paramount right of public navigation. But if it be in the state, the riparian owner still has, subject to this same public right, the exclusive right of possession and the entire beneficial interest. Hence the determination of the question one way or the other would not affect the value of the riparian owner's interest in the property, or the amount of compensation he is entitled to.

"Suppose, however, a riparian owner has unlawfully intruded into the water beyond the point of navigability, as above defined, and filled up the bed of the stream beyond that point, for the sole purpose of extending his possessions, and so as to obstruct and interfere with the public right of navigation. This would constitute a purpresture. The public would have a right to abate it as a public nuisance. It would give no rights to the person who made it. It would not forfeit or destroy his riparian rights as they existed before, but he could claim no additional rights on account of it. When it is proposed to take his property for public use by the exercise of eminent domain, he can claim no additional compensation by reason of it. * * *

"Whether, in view of the fact that the rights of the state to the stream and its bed are sovereign and not proprietary, and are held by it in trust for the public as a highway, and the further fact that Congress has, in the act authorizing a state government, expressly provided that the Mississippi river and the waters leading into the same shall be common highways and forever free to the inhabitants of the state, and all other citizens of the United States, the Legislature has the power to divert the bed of the St. Croix from the trust for which it was vested in the state, and destroy the public use of it as a public highway, is a question not here involved, and which we do not consider. It is sufficient to say that they cannot by any such grant impair or take away the riparian rights of the respondents without compensation."

Here the court declares that it is the settled doctrine in this state that the riparian owner has the fee to low-water mark, citing Schur-

meier v. St. Paul & Pac. Railroad Co., supra, and Brisbine v. St. Paul
& Sioux City Ry. Co., supra. But see, also, In re Minnetonka Lake
Improvement Co., supra. But may it not be that in this declaration
the error heretofore referred to into which it fell, as to the construc-
tion placed by the Supreme Court of the United States upon the acts
of Congress regulating the survey and sale of public lands, still dwells
with it? And may it not be that it means to declare that the riparian
owner has the absolute and unqualified fee to low-water mark, and, in
view of what is further said in the opinion, may it not be that it had
in mind that, but for what it supposed to be the holding of the Su-
preme Court of the United States in the Schurmeier Case such ri-
parian owner would also have a qualified fee in the soil under water?
The court seems to have overlooked, influenced possibly by the error
above referred to, what was the real holding in the Schurmeier Case,
to wit, that the riparian owner has the fee at least to low-water mark,
and the very clear declaration there by Judge Wilson that under the
common law the title in fee of the riparian owner extends to the mid-
dle thread of the stream, subject only to the public easement, and the
inevitable inference that such is the law in this state, and that it would
so have been determined in that case if necessary to support the con-
clusion reached. It repeats what had been said in former decisions as
to the right of the riparian owner to build and maintain suitable land-
ings, piers, and wharves, on and in front of his land, and to extend the
same therefrom into the river to the point of navigability, even be-
yond low-water mark, and, to this extent, exclusively to occupy for
such and like purposes the bed of the stream, subordinate only to the
paramount public right of navigation, and after declaring that the
question whether the fee to land made by the riparian owner, in the
exercise of his riparian right to make available and useful the naviga-
ble part of the stream, by reclaiming the land beyond low-water mark
by artificially filling with earth out to the requisite depth of water,
would be in the state or in the riparian owner, is one of speculative in-
terest only, and not one of any practical importance, it goes on to say:

"If the fee be in the riparian owner, yet, of course, it must be a qualified
fee; that is, subject to the paramount right of public navigation. But if it
be in the state, the riparian owner still has, subject to this same public right,
the exclusive right of possession and the entire beneficial interest."

The question at once suggests itself to the mind: If a riparian
owner could reclaim the land under the water beyond low-water mark
by artificially filling with earth from the shore line to the point of
navigability, and would have, subject to the paramount right of public
navigation, the exclusive right of possession and the entire beneficial
interest in said land, could he not make, by artificially filling in, an
island between his shore line and the point of navigability, and have
the exclusive right of possession and the entire beneficial interest there-
in, subject to said paramount right? See Hanford v. St. Paul & Du-
luth R. Co., and Bradshaw v. Duluth Imp. Mill Co., hereinafter re-
ferred to. And if he would have such exclusive right of possession
and entire beneficial interest in such made island, would he not also
have such exclusive right of possession and such entire beneficial in-

terest in an island made by the action of the waters between his shore line and the point of navigability?

In this connection we should also bear in mind what the court says, as to the term "point of navigability," that:

"It is not to be understood in the narrow sense of being limited to that point where the waters of the stream may be navigable for some purposes at certain stages of the water. When it is said that a riparian owner may construct landings, etc., to the 'point of navigability,' it must be understood as giving him the right to do so to the extent necessary to make his abutting property reasonably available at any ordinary stage of water, for any kind of navigation for which the stream is used, and for which it is adapted, provided, of course, it does not obstruct the paramount rights of the public."

In the case of Lake Superior Land Co. v. Emerson et al., 38 Minn. 406, 38 N. W. 200, 8 Am. St. Rep. 679, the action was brought by the plaintiff to remove, from its title to the blocks of land described in the complaint and opinion, the cloud created by the execution and record of the deed of block 122, described in the opinion. The trial judge ordered judgment for the plaintiff, and upon appeal this judgment was affirmed. The Supreme Court states the facts as follows:

"In 1858 the owner of what is known as 'Rice's Point,' a point of land extending into that part of Lake Superior now called the 'Bay of Duluth,' platted the same as a town, and recorded the plat. On the plat there were delineated certain blocks, numbered 64, 75, 84, and 95. The streets separating these blocks have since been duly vacated, so that they now lie in one solid parcel of land, which is bounded on the east by the waters of the bay. At the time of the platting, said parcel as platted extended to and beyond the low-water mark, and the bay front of the parcel was then, ever since has been, and now is, under water. There were also delineated, on said plat, blocks in part of said parcel, which were, as shown on the plat, in the water beyond the low-water mark, and where the person then platting had no title to the land. Among the blocks so delineated in the water, and below the low-water mark, was one numbered 122. The said owner thereupon conveyed blocks 64, 75, 84, and 95, and plaintiff now has the title so conveyed. On the same day said owner executed to one Wilson a deed purporting to convey to him block 122, and Wilson subsequently executed to the defendants a deed purporting to convey said block to him. Plaintiff is in the actual possession of the blocks so conveyed to it."

The court then goes on to say:

"The chief question in the case is: What did the plaintiff's and the defendant's grantors respectively get by the deeds from the said owner? That owner owned the land only to low-water mark. The title to the soil beyond that, and under the water, was in the state. The only rights he could have beyond the low-water mark were certain riparian rights incident to land bordering upon a navigable stream or lake. Among these were the right to enjoy free communication between his abutting premises and the navigable waters of the lake, to build and maintain suitable landings, piers, and wharves on and in front of his land, and to extend the same therefrom into the lake to the point of navigability, even beyond low-water mark; and to this extent exclusively to occupy for such and like purposes the bed of the lake, subordinate to the public paramount right of navigation. Brisbine v. St. Paul & Sioux City R. Co., 23 Minn. 114; Union Depot, etc., Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626 [47 Am. Rep. 789]. These rights pertain to the use of abutting land in connection with the water, or of the water in connection with the land. The right to use beyond the low-water mark rests upon the title to the bank, and not to the bed of the water. Diedrich v. Northwestern Union Ry. Co., 42 Wis. 248 [24 Am. Rep. 399]. It is a right peculiar to the owner of the land bordering on the lake or stream, and not possessed by others.

Morrill v. St. Anthony Falls Water Power Co., 26 Minn. 222, 2 N. W. 842 [37 Am. Rep. 399], and cases cited. The owner of the abutting land has the right to enjoy, for the purposes of gain or pleasure, all the facilities which the location of his land with reference to the lake affords. Delaplaine v. Chicago & N. W. Ry. Co., 42 Wis. 214 [24 Am. Rep. 386]. It exists jure naturæ, because the land has, by nature, the advantage of being washed by the stream. Lyon v. Fishmongers' Co., 1 App. Cas. 662. The right is incident to the land—belongs to it by nature. We have not found any case holding that it may be severed from the right to the abutting land, so as to become a right in gross: one person owning exclusively the shore, and another the riparian right incident to it, though owning no shore. As the owner of the shore has no title to the soil under the water, he can convey nothing in the soil; and, as he cannot convey the riparian right severed from the shore, his deed of conveyance of the soil under the water must be inoperative. Undoubtedly he may release his riparian right to the owner of the soil under the water—the state, or its grantee or licensee. Perhaps he may transfer the right to the owner of shore land, in connection with which it can be used and enjoyed, though not directly abutting: but that is not this case. Riparian rights incident or appurtenant to no land cannot exist. No interest passed by the deed under which defendants claim. The grantee in that deed, and his grantees, must be presumed to have known the situation and character of what the deed purports to convey, so that no estoppel could arise by reason of it. * * *

"The act making Rice's Point, as platted, a part of the city of Duluth, cannot be construed as a transfer or surrender by the state of its title to the soil below low-water mark."

It would be difficult to find a decision in which the premises on which the conclusion is based are more clearly and emphatically stated, and, these premises being admitted or assumed, Judge Gilfillan, with that unerring logic for which he was so justly distinguished, reached the conclusion announced in the opinion. He could not reach any other conclusion. But, as will be seen hereafter, not only have the premises been abandoned by the court, but the conclusion as well; the case having been entirely overruled. And here may it not be again said that, where the court declares that the owner of the shore line has no title to the soil under the water, the error heretofore referred to, into which the court had fallen in St. Paul, etc., R. Co. v. First Div., etc., R. Co., supra, still remained with it?

In Miller v. Mendenhall, 43 Minn. 95, 44 N. W. 1141, 8 L. R. A. 89, 19 Am. St. Rep. 219, the court says:

"This case involves the consideration of the riparian rights of the owners of lands abutting upon the Duluth Harbor or Bay of Superior, in the shoals or land covered by water between low-water mark and the deep or navigable waters, and within the dock or harbor line established by the authority of the Legislature. These waters are within the jurisdiction of the state and federal governments, and the state holds the title to low-water mark in its sovereign capacity, in trust for the people, for the purpose chiefly of protecting the rights of navigation. But, though the title is nominally in the state, the common right of the people is limited to what is of public use for the purposes of navigation and fishery; and the riparian owners are permitted to enjoy the remaining rights and privileges in the soil under water beyond their strict boundary lines, after conceding to the state all the public rights. Gould, Waters, § 168. The right of access and communication with the navigable waters, which pertain peculiarly to the ownership of the upland, in order to be available and of practical use, necessarily includes the right to fill in and to build wharves and other structures in the shallow water in front of such land, and below low-water mark, and the exercise of such rights, though subject to state regulation, can only be interfered with for public

purposes; and such improvements are encouraged because they are in the general interest of navigation and commerce, and are a public as well as a private benefit. In Dutton v. Strong, 1 Black, 23, 32 [17 L. Ed. 29], it is said that: 'Wherever the water is too shoal to be navigable, there is the same necessity for such erections for lake navigation as in the bays and arms of the sea; and, where that necessity exists, it is difficult to see any reason for denying to the adjacent owner the right to supply it.' And in Yates v. Milwaukee, 10 Wall. 497 [19 L. Ed. 984], it is held broadly that these riparian privileges are to be treated as valuable property rights, which cannot be taken or interfered with for public use without compensation. Union Depot, etc., Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626 [47 Am. Rep. 789]. And if a stranger makes a filling or an obstruction in the waters in front of his land, the owner of the adjacent upland may enjoin its continuance, or recover in trespass, if not in ejectment. * * *

"The action of the state, through the Legislature, in establishing the dock lines, is to be construed in connection with the established doctrine of riparian rights of which we have spoken, and the practical use permitted and necessarily made by riparian owners of land under water in front of the dry or upland. In Ahorn v. Smith, 12 R. I. 370, it is said by the court that the owners of the upland are in such cases impliedly permitted to carry the upland forward to the harbor line, so that each owner will occupy the part abreast his own land. In Gerhard v. Bridge Com'rs, 15 R. I. 334, 5 Atl. 199, and in Engs v. Peckham, 11 R. I. 210, 223, 224, it is held to be a permission and invitation by the state to the riparian owner to fill out and incorporate the flats with his upland to the line. Eldridge v. Cowell, 4 Cal. 80. In Fitchburg R. Co. v. Boston & Maine R. Co., 3 Cush. [Mass.] 58, 71, it appeared that the Legislature had established a harbor line for Boston Harbor, but prohibited the extension of the existing wharves to the line without legislative permission. Afterwards the Legislature passed an act authorizing the owners of certain wharves to extend them out to the line. This act was held to be a grant, and not a mere revocable license (page 87), and in Hamlin v. Pairpoint Mfg. Co., 141 Mass. 51, 57, 6 N. E. 531, a legislative authority to extend wharves to the channel of a river was held equivalent to a grant of a possessory title, if not an absolute interest in the soil. In Norfolk City v. Cooke, 27 Grat. [Va.] 430, 438, the court treats the right to use and occupy the land within such lines with wharves, etc., as a qualified proprietary interest in the soil, sufficient to support an action for the possession. Guy v. Hermance, 5 Cal. 73 [63 Am. Dec. 85]; Power v. Tazewells, 25 Grat. [Va.] 786. But the title of the state is not extinguished by such legislative action merely. In this country the generally accepted doctrine is that the jus privatum passes to the owner of the adjacent lands, and in this state extends to low-water mark, with the accompanying riparian rights, while the jus publicum belongs to the state, which holds the title to the soil under the water as trustee. 'The sovereign is trustee for the public, and the use of navigable waters is inalienable.' 3 Kent, Comm. 427. See Com. v. Alger, 7 Cush [Mass.] 53, 89, 93.

"The state is authorized to regulate the exercise of riparian rights in the interests of the public, and may also make concessions to private owners of possessory rights in the soil of navigable waters, the effect of which will be to give them private and exclusive rights equivalent to a grant. Gould, Waters, §§ 138–140. While the public right of navigation and fishery may not be extinguished until the waters are excluded, yet after the submerged land is filled or occupied the riparian owner will have the exclusive right of possession, and the entire beneficial interest; and whether his dominion would be absolute, and his title indefeasible as against the state, is not necessary to inquire. Union Depot, etc., Co. v. Brunswick, supra. The action of the Legislature in establishing a harbor line is to be construed as a regulation of the exercise of the riparian right. It settles the line of navigability, above which the state will not interfere, and is an implied concession of the right to build, possess, and occupy to the established line, which amounts practically to a qualified possessory title. 141 Mass. 51, 6 N. E. 531, supra. The importance and substantial character of these rights are recognized by the courts, and there is a growing tendency in different directions to give effect to contracts

and grants in respect to riparian occupancy and improvements. Norfolk City v. Cooke, 27 Grat. (Va.) 430, 436; Parker v. West Coast Packing Co., 17 Or. 510, 515, 21 Pac. 822 [5 L. R. A. 61]. It is true the right of access and communication with the navigable water belongs exclusively to the riparian owner, except with his permission. But if in the case of a railway corporation he may, for a consideration, concede the right to occupy with its roadbed the land under the shore, and obstruct such communication, by a valid contract, which we presume will not be questioned, why may he not contract with natural persons to grant to them the right of possession and occupancy of building sites within the dock line for wharves or elevators, for use in connection with navigation, or such other purposes (the state not objecting), as the grantees may be advised, with right of way, if need be, over his land, or, as in this case, impliedly over streets laid over the same, as designated in the plat and dedicated to the public use? In many instances, however, such right of entry or easement of passage may be found entirely unnecessary; the occupant having other means of reaching the locus in quo. If the riparian owner may make such improvements, and afterwards grant and convey his possessory title, or contract to do so, the courts ought not to stand upon so narrow a distinction as that he may not bind himself by contract that another may have and enjoy the same possessory rights in a particular site or lot which he has in it, for his right is not a mere revocable license, though held in subordination to the public interest, and subject to some restraint for the general good as other property may be, though differently situated. Com. v. Alger, 7 Cush. [Mass.] 53, 95."

While in this case, as in all the Duluth, or Rice's Point, cases herein cited (Lake Superior Land Co. v. Emerson; Hanford v. St. Paul & Duluth R. Co.; Bradshaw v. Duluth Imperial Mill Co.), the discussion of the rights of riparian owners is predicated upon a condition there existing by the establishment of a dock or harbor line, yet, in view of what the court here says as to the action of the Legislature in establishing a harbor line being a regulation of the exercise of the riparian right, and in farther view of what it says in the Bradshaw Case, which will hereafter be referred to, it is apparent that it here recognizes and declares generally: That, while the state holds the title to the bed of a navigable lake or stream below low-water mark, its ownership of the soil under the water is not proprietary but in its sovereign capacity, in trust for the people for public purposes connected with the use of the water, and chiefly for the purpose of protecting the public rights of navigation. That, though the title is nominally in the state, the common right of the people is limited to what is of public use for the purposes of navigation and fishery. That the riparian owners are permitted to enjoy the remaining rights and privileges in the soil under water beyond their strict boundary lines— that is, below low-water mark—after conceding to the state all the public rights. That these rights and privileges are to be treated as valuable property rights which, though held in subordination to the public interest and subject to state regulation, would entitle such owner, as against a stranger who should make a filling or an obstruction in the waters in front of his land, to an injunction restraining the continuance of such filling or obstruction, or to recover in trespass, if not in ejectment. In other words, that, while the title of the state for the purpose of protecting the public rights of navigation and fishery is paramount, its ownership is not absolute or proprietary, but is a limited or qualified ownership—limited to the protection and

preservation of these public rights—and that the riparian owner has also a limited or qualified title to the soil under the water, which is proprietary, and as to all others than the state exclusive, and even as to the state in some measure proprietary.

In Hanford v. St. Paul & Duluth Railroad Co., 43 Minn. 104, 42 N. W. 596, 44 N. W. 1144, 7 L. R. A. 722, the dock line had been established subsequent to the acquisition of defendant's title, and the opinion delivered after reargument is based upon a broad consideration of the rights of riparian owners of land abutting upon navigable waters in the soil under water beyond low-water mark, and fully discusses and declares the law in this state in respect to the rights or ownership of the state and the rights or ownership of the riparian proprietors in such soil.

In the first opinion of the court, the decision in Lake Superior Land Co. v. Emerson, supra, was adhered to, and the case was decided on the doctrine there declared that the defendant, having the exclusive right to possess and use the shore, had also the right to possess and enjoy the riparian rights appurtenant to the shore, and that such rights could not be alienated or severed from the riparian land. But in the opinion delivered after the reargument the court, after referring to the Emerson Case, and saying that in view of the importance of the subject they had entered into a full examination and reconsideration of it, declares that it had been thus led to the conclusion that the proposition that the riparian proprietor's right of occupancy and use of lands beyond the boundary of his ownership in fee is inalienable and incapable of existence, apart from the right of occupancy and use of the adjacent bank, should not be adhered to. It then declares that it did not sufficiently consider in former decisions the peculiar nature, extent, and relation of the private and public rights, respectively, in the lands lying between the boundary of the riparian owner's fee and the point of navigability, and that undue importance had been given to the fact that these riparian rights have their origin in the relation of the riparian lands to the water, and are properly incident or appurtenant to the riparian lands. It then directs attention to the "facts," as it calls them, that those riparian rights partake largely of the ordinary qualities of private property, which is in general divisible and transferable by the proprietor, that they are of such a nature that they may be enjoyed separate from the adjacent lands to which they were originally appurtenant, and that there is an absence of substantial reasons, so far as the nature of these rights are concerned, why they may not exist independently of the adjacent riparian estate. It then says that it does not affirm that all riparian rights are thus severable, and that some, from the very nature of things, may be incapable of separate existence; but it does not indicate what these are.

The court then goes on to say (I quote at great length because I deem it necessary to a full understanding of the decision):

"In this state the title of the proprietor of lands abutting upon navigable waters extends to low-water mark; the bed of the stream or body of water below low-water mark being held by the state, not in the sense of ordinary absolute proprietorship, but in its sovereign governmental capacity, for com-

mon public use. Union Depot, etc., Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626 [47 Am. Rep. 789], and cases cited. The estate or interest of the riparian owner in the bed of the stream above (*below?*) low-water mark is subject to the right of the public to use the same for the purposes of navigation; but, restricted only by that paramount public right, the riparian owner enjoys valuable proprietary privileges, among which we shall consider particularly the right to the use of the land itself for private purposes. A considerable extent of the shores, not only along tide waters of the ocean coasts, but on our great inland waters, are of such a nature, out to and even beyond low-water mark, as to be in general unavailable by the public for the purposes of navigation, and must remain forever waste and useless lands, unless reclaimed by artificial means from the shallow water covering them, or unless otherwise improved. It is established beyond question in this state, and in other states as well, that the proprietor of the riparian lands may make such improvements. Subject only to the limitation that he shall not interfere with the public right of navigation, he has the unquestionable and exclusive right to construct and maintain suitable landings, piers, and wharves into the water, and up to the point of navigability, for his own private use and benefit. (Citing cases.) And it is obviously immaterial, if the public interest be not prejudiced, whether the submerged land be covered with wharves of timber or stone, or be reclaimed from the water by filling in with earth so that it becomes dry land. The land may be so reclaimed. (Citing cases.) As the right of private use and enjoyment of the improved or reclaimed premises will continue so long, at least, as it does not interfere with the limited and defined public interests, it is obvious that, in general, it may continue forever.

"This private right of use and enjoyment is not, we think, limited to purposes connected with the actual use of the navigable water, but may extend to any purpose not inconsistent with the public right. (Citing cases.) As was said in Morrill v. St. Anthony Falls Water-Power Co., 26 Minn. 222, 228, 2 N. W. 842 [37 Am. Rep. 399], referring to the decision in Dutton v. Strong, 1 Black, 23 [17 L. Ed. 29]: 'The right to encroach upon the shallow water of the lake, by an exclusive appropriation even of the underlying soil, must rest upon the proposition that the riparian owner may make any use of the lake or river opposite his land not inconsistent with the public right.' The following language of the Morrill Case, just cited, although used with reference to the riparian right to use the water of a navigable stream, is applicable here: 'The limit to the private right is imposed by the public right, and the private right exists up to the point beyond which it would be inconsistent with the public right.' No one but the riparian proprietor has the right to improve and occupy such premises for private purposes, and it does not concern other persons how or for what particular purposes the reclaimed lands may be used, so long as there is no violation of the maxim, sic utere tuo ut alienum non lædas. It is for the interest of the state that such lands, not available for the public purposes for which alone the state exercises authority over them, shall be improved and used for profitable enterprises, rather than that they lie forever waste and unproductive. And the state, while recognizing the ancient riparian right of occupancy, has not assumed to prescribe or limit the purposes or manner of its enjoyment. That seems to have always been left to the discretion of the person in whom the right is exclusive, and the decided cases afford many illustrations of uses in no way connected with the purposes of navigation.

"This right of the riparian proprietor, even before it has been in any manner exercised by reclaiming or improving the premises—the right itself to reclaim, improve, or occupy—is a property right, vested in him, recognized and protected in the law as property. He cannot be deprived of it without due process of law. It cannot be taken from him, and devoted to public use, without compensation. (Citing cases.) Such property is subject to the law of eminent domain. A railroad company, locating its line of road over such submerged lands, might acquire, by condemnation proceedings and the payment of compensation, the necessary right of way, divesting the riparian owner of so much of his property. But cannot the riparian proprietor voluntarily convey, for an agreed compensation, what the company could thus take from him by legal proceedings in invitum? If he were to convey by deed the right to oc-

cupy exclusively for railroad purposes the premises in front of the riparian lands, would not the company acquire a right to occupy and enjoy the use of the premises, although it took no interest in the upland estate?

"These peculiar property rights of the riparian owner may constitute, estimated in connection with the riparian land, the chief value of the premises. It may even be that the whole value of such real property consists in the right to improve and occupy the submerged lands for private purposes. The extent of the riparian right in this respect is not measured by the value of the upland, nor by the distance to which the owner's estate may extend inland from the shore. The barest strip of upland, though wholly valueless and useless in itself, justifies the owner in the exercise and enjoyment of the privileges of riparian proprietorship to the fullest extent. .

"If it be true, as we have said, that the riparian proprietor may improve and occupy such premises in any manner not inconsistent with the public rights, it follows that, although the origin of this peculiar private right is referable to an adjacent riparian estate to which it was originally incident or appurtenant, still its nature and qualities are not in themselves such as to forbid its alienation, its separation from the riparian estate, and its enjoyment by others than the occupants of the upland. Its enjoyment need not be in aid of or associated with the use to which the upland is devoted, or for the benefit of the upland as such. Thus it is supposed that one acquiring a mere right of way for the purpose of access over the upland to the shore may acquire the riparian owner's right to occupy and improve the waste land beyond. New Haven Steamboat Co. v. Sargent, 50 Conn. 199 [49 Am. Rep. 632]. The upland may be used, and be useful, only for purposes to which the use of the adjacent submerged lands, even after reclamation, would be in no manner accessory. The upland may be owned and used exclusively for the purposes of a residence, a church, a hospital, a bank, or for any purpose wholly unconnected with the advantages incident to the adjacency of navigable water, or of the intervening waste land; and yet the proprietor might undoubtedly erect a wharf, or fill in solid earth, and allow others to use the wharf or reclaimed land. Nor would his right to allow others to use the wharf or made land, or the right of others to use it with his consent, depend upon there being also a license of access to such premises over the abutting upland. We suppose that the landowner might grant to one having no riparian possession in the vicinity the right to use his wharf, or the improved or reclaimed shorelands, for any purpose, whether connected with navigation or not, just as the owner himself might do. No individual whose rights were not prejudiced could complain, and, so long as the public rights are not interfered with, the state is not interested to oppose such use, but rather is interested to encourage and sanction it, without regard to the fact whether or not the use be associated with the use of the upland.

"It has been suggested in some cases that even though such rights cannot be wholly disconnected from riparian lands, and be enjoyed in gross, yet, if the person to whom the rights of the riparian proprietor have been relinquished has access to the premises over the next adjacent estate abutting upon the shore, he may enjoy such rights, although he has no interest in the estate to which they were previously incident (see New Haven Steamboat Co. v. Sargent, 50 Conn. 199 [49 Am. Rep. 632]) and this is spoken of as being possible in Lake Superior Land Co. v. Emerson, 38 Minn. 407, 38 N. W. 200 [8 Am. St. Rep. 679]. But this would seem to be inconsistent with the doctrine that such rights are not severable from the riparian estate to which they are by nature appurtenant. The whole reason supporting that doctrine is the technical reason that the rights are merely incident and appurtenant to the abutting riparian land. They were not originally incident to other estates than those adjacent to and in front of which only these privileges might be exercised. The owner of a riparian estate had no peculiar privileges in the submerged land lying in front of the next adjacent estate. If it be conceded that these rights may be separated from the parent estate, and be enjoyed by the owner of the next estate abutting upon the shore, there is no room for further contention. If such separation is possible, it matters not whether the means of access and opportunities for enjoyment be through the next estate abutting upon the shore, or the next, or by means of a public highway leading to or past

the premises in question, or by the navigable water, or in any other manner. Any person who may acquire from the riparian owner his right to improve and occupy such premises may always have access to them by means of the navigable water—a common highway. He may acquire other means of access. We think that there is nothing in the matter of access which forbids the existence of these rights separate from the abutting estate.

"In some jurisdictions it is considered that the adjacent riparian owner actually acquires title to the lands improved and reclaimed from the water, although the title was before in the state in actual proprietorship, and that he may then convey the reclaimed premises to persons having no interest in the upland (as in New Jersey). See New Jersey Zinc & Iron Co. v. Morris Canal Co., 44 N. J. Eq. 398 [15 Atl. 227, 1 L. R. A. 133]; Goodsell v. Lawson, 42 Md. 348, 362; Nichols v. Lewis, 15 Conn. 137; Clement v. Burns, 43 N. H. 609. We do not wish to be understood as assenting to the proposition that the title of the state may be thus transferred by acts of the riparian proprietor which the state has no particular reason at the time for opposing. It may be doubtful whether the title does not remain unchanged, and whether if, in the future, it should become necessary for the state to broaden the navigable channel so as to embrace the reclaimed land, it would not have the right to do so. However that may be, we deem these decisions to lend some support to the doctrine that the riparian right to fill and reclaim and use the submerged lands for his own private purposes is not necessarily so annexed to his proprietorship of the upland that it cannot be severed. If the right to occupy and use the premises is transferable after they have been improved by the exercise of the legal rights of the riparian proprietor, we see no sufficient reason why his legal right to improve and occupy and use the premises should not also be transferable. If it be said that in the one case he has the legal title and in the other he only has the valuable right of occupancy and improvement, with the power thereby to acquire the legal title, it may be answered that such rights are themselves ordinarily a proper subject of transfer.

"It is remarkable that so few authorities are to be found directly deciding the question of the severability of such riparian rights. The question was directly decided in Simons v. French, 25 Conn. 346; it being held that the right of the riparian proprietor to wharf out to navigable water, over the flats (the fee of which was in the state for the purposes of navigation), was not inseparably incident to the upland estate, but was subject to conveyance or reservation by itself. It is claimed that Simons v. French was overruled or modified in New Haven Steamboat Co. v. Sargent, 50 Conn. 199 [49 Am. Rep. 632]. We do not understand the latter decision to have such an effect. The court was careful to declare that its decision was based upon the peculiar circumstances of that case, and, while there is language suggesting a doubt as to Simons v. French, in other parts of the opinion the essential doctrine of that case seems to be reaffirmed. To the same effect as Simons v. French is Parker v. West Coast Packing Co., 17 Or. 510, 21 Pac. 822 [5 L. R. A. 61]. In Yates v. Milwaukee, 10 Wall. 497 [19 L. Ed. 984], the owner of a lot on a navigable river (Shepardson), who had begun to build a wharf in front of it into the river, conveyed to Yates the interest he had in the wharf and in front of the lot to the center of the river, with the right of docking out and making a water front on the river. Yates built the wharf. His right to maintain it came in question in this action against the city. His right was sustained, although without any discussion of the question of severability. The court said: 'We are of opinion that Shepardson, as riparian owner of a lot bounded by a navigable stream, had a right to erect this wharf, and Yates, the appellant, whether he be regarded as purchaser or as licensee, has the same right.' The court seems to have regarded it as immaterial whether Yates' grantor owned the fee beyond the shore line or not. It would seem that Yates had probably a way of access to the premises covered by the wharf by means of a street leading down past the lot to the water; but we do not regard this as of controlling importance. See, also, Bowman v. Wathen, 2 McLean, 376 [Fed. Cas. No. 1,740]. In Massachusetts the fee of the riparian owner extends to low-water mark, not exceeding 100 rods beyond high-water mark; but it is held subject to the general public

right of navigation, until the premises shall have been so improved as to exclude the public use. Com. v. Alger, 7 Cush. [Mass.] 53. And so in Maine. It would seem that the real beneficial interest which the riparian owner enjoys in such premises in those states does not greatly differ from the rights of riparian owners in this state. But it is there held that he may convey his upland without the submerged lands, or the latter without the former. Storer v. Freeman, 6 Mass. 435 [4 Am. Dec. 155]; Barker v. Bates, 13 Pick. [Mass.] 255 [23 Am. Dec. 678]; Deering v. Long Wharf, 25 Me. 51. These authorities may be regarded, at least, as supporting the proposition that there is nothing in the essential nature of the riparian owner's right to improve and occupy such premises which forbids its separation from the riparian estate."

The court then summarizes its conclusions as follows:

"We have thus considered: That the riparian proprietor has the exclusive right—absolute as respects every one but the state, and limited only by the public interest of the state for purposes connected with navigation—to improve, reclaim, and occupy the submerged land, out to the point of navigability, for any private purpose, as he might do if it were his separate estate. That this right, even though it may never have been exercised, is recognized and protected by the law as property, of which he cannot be deprived even by the state without just compensation. That the enjoyment of the right—the use of the premises—need not be associated with the use of the upland. That it is for the interest of the state that such waste lands be improved and rendered profitable, while the state is not concerned as to whether the owner of the adjacent upland, or some person to whom he may release his right, make the improvement and enjoy the private benefit. That the rights of other persons are not involved in the question. That when the land has been reclaimed it may be conveyed, according to most of the authorities, apart from the original upland, and according to the other authorities the riparian right may be transferred to and enjoyed by the owner of the next adjacent riparian estate. From these considerations, as well as from the authorities cited bearing directly upon the question, we think that the quality of alienability should be deemed to belong to this kind of property, as it does to property in general. See opinion of Bramwell, B., in Nuttal v. Bracewell, L. R. 2 Exch. 1, 11. The only reason opposed to this is the technical one that the right grows out of, and, until severed, is incident to, a riparian estate. We have come to feel that this is unsatisfactory as a reason why such property should be deemed inseparable from the parent estate and incapable of a separate existence. If the right in question were created out of, or enjoyed at the expense of, some other estate or property, and were measured and limited by the needs or use peculiar to the riparian estate to which it is annexed, there would be ground for others to urge that the right could not be changed or transferred so as to enlarge the scope of a grant or contract, or so as to prejudice the party complaining. But no such conditions exist. The rights of no one are affected by allowing the riparian owner to convey away this part of his property as he may his other property. It is only an abstract question whether the right, originating in custom, and having originally attached as an incident to his riparian lands, may now be sold and conveyed, and be enjoyed by the purchaser. It is for the interest of the riparian owner that he be allowed to dispose of or use his private property at his own discretion. It is for the interest of the public that such property be subject to purchase and use, where the owner may be incapable of improving it. No one is interested in opposing such unrestricted alienability and use.

"Although we have become convinced that the better reason is opposed to our former decision upon this point in Lake Superior Land Co. v. Emerson, 38 Minn. 406, 38 N. W. 200 [8 Am. St. Rep. 679], we should have deemed it better that a rule of property, although so recently declared, should not be disturbed, were it not that it is supposed that the result of that decision, if adhered to, would be very seriously prejudicial to the tenure of a large amount of very valuable property, which for a long time has been deemed

and treated as alienable and enjoyable apart from the riparian lands, and which, according to our present opinion, was rightfully so treated prior to our decision in the Emerson Case. The case before us shows that in front of the riparian land described in the complaint the reclaimable submerged land extends into the Bay of St. Louis about 850 feet to a dock line legally established under the authority of the state (subsequent, however, to the condemnation by the railroad company), and this condition of things is understood to be very general along the shores of the navigable waters about Duluth. Such lands have been platted and sold to various persons, and have been to a considerable extent improved, and, so far as the state is concerned, have practically become private property. No one but the owners of the original riparian estate can question the rights of the purchasers; and in the case of Miller v. Mendenhall, pra [43 Minn. 95, 44 N. W. 1141, 8 L. R. A. 89, 19 Am. St. Rep. 219], which was submitted and is decided in connection with this case, we hold that, notwithstanding the decision in the Emerson Case, a grantor may be estopped by his covenants from disputing the title of his grantee in respect to such lands. We think that we ought to go further, and hold that the riparian right to improve, reclaim, and occupy such premises is transferable." 

The court here recognizes and declares in language too clear to be misunderstood, broadly and independently of the establishment of a, dock line: That the owner of lands abutting upon navigable waters, whether they be streams or lakes, has an exclusive estate or interest in the bed of the stream or lake below low-water mark in front of his shore land, subject to the right of the public to use the same for the purposes of navigation, and restricted only by that paramount public right; that he has the exclusive right to reclaim it by artificial means from the shallow water covering it, or to otherwise improve it, by constructing and maintaining suitable landings, piers, and wharves into the water, or by filling in with earth so that it becomes dry land, up to the point of navigability, for his own private use and benefit, as he might do if it were his separate estate, subject only to the limitation that he shall not interfere with the public right of navigation; that this private right of use and enjoyment is not limited to purposes connected with the actual use of the navigable water, but may extend to any purpose not inconsistent with the public right; that "the limit to the private right is imposed by the public right, and the private right exists up to the point beyond which it would be inconsistent with the public right"; that no one but the riparian proprietor has the right to improve and occupy such premises for private purposes, and it does not concern other persons how or for what particular purposes the reclaimed lands may be used, so long as there is no violation of the public right or of the maxim, sic utere tuo et alienum non lædas; that this right, even before it has been in any manner exercised—the right itself to reclaim, improve, or occupy—is a property right, vested in him, recognized and protected in the law as property, of which he cannot be deprived even by the state without due process of law, and without just compensation, except, of course, for the purpose of protecting, preserving, and improving navigation; that this right, estate, or interest can be severed from his shore land and conveyed to another to be enjoyed by such grantee; that access may be had thereto through the next estate abutting upon the shore, or the next, or by means of a public highway leading to or past the prem-

ises in question, or by the navigable water, or by any other means which he or his grantee may acquire; that there is nothing in the matter of access which forbids the existence of these rights separate from the abutting estate; and that the enjoyment of the right need not be associated with the use of the upland.

And it may be said that here the court seems to be beginning at least to shake off the error into which it had fallen in St. Paul, etc., R. Co. v. First Division, etc., R. Co., above referred to.

In Wait v. May et al., 48 Minn. 453, 51 N. W. 471, in 1854 the occupants of certain government lands caused the same to be platted as a town site, with a street therein laid out upon and along the shore of a navigable lake. The street was stated on the plat to be 99 feet in width, but according to the scale given upon the plat this street, opposite plaintiff's lot, appeared to be 150 feet wide, and extended in width to the waters of the lake. The plat was filed for record in the office of the register of deeds for the proper county June 26th of that year. Thereafter, on April 17, 1856, this town site was entered and purchased, and title thereto obtained, by a judge of the district court, as provided by Act Cong. May 23, 1844, c. 17, 5 Stat. 657. In the execution of his trust said judge, on July 8, 1856, conveyed to one of the beneficiaries, from whom plaintiff derived title, a lot fronting upon the street before mentioned, describing the same in accordance with the town plat. On October 4, 1880, the village council had by ordinance authorized the Minneapolis & Lake Park Railway Company, its successors and assigns, to construct its tracks, wharves, and depot on the lake shore across the street in front of this lot. The defendant railway company succeeded to these rights, and the other defendants were its tenants. For several years prior to August, 1888, when the action was commenced, defendant railway company had kept and maintained its roadbed and railway tracks on the street along and in front of plaintiff's lot, but not nearer than 75 feet from the front line thereof as traced on the plat, and had erected on the shore, and in and over the water of the lake, a wharf and a pavilion for the use of railway passengers. The action was against Charles May, Frank Bardwell, and the St. Paul, Minneapolis & Manitoba Railroad Company to recover possession of the premises so occupied, with damages for the detention, and, further, to forever restrain the defendant corporation from maintaining its roadbed, tracks, and pavilion thereon, and the question which arose in the case was as to the title of the plaintiff in the part of the street between the center line thereof and the shore, on which the roadbed and tracks were maintained, in front of his lot, and the court held that, under the circumstances of the case, the platting and entry of the town site under the federal statute, the deed of the judge thereunder, and the necessary intentions of the parties platting, and of the judge conveying, the fee title, subject to the public easement, to the entire street to low-water mark, including all riparian rights, passed to the grantee named in the official deed, and also passed to plaintiff, through subsequent conveyances, in which was the same general description, and the judgment of the trial court in favor of the plaintiff was affirmed.

In the case of Gilbert v. Eldridge et al., 17 Minn. 210, 49 N. W. 679, 13 L. R. A. 411, the facts are fully stated in the opinion, and need not be set forth here. The court adhered to its ruling in the case of Hanford v. St. Paul & Duluth Ry. Co., supra, and decided: That a riparian owner of lands on the shore of navigable water may legally disassociate therefrom and transfer to another, or reserve to himself, to be enjoyed independent of the shore land, his riparian right to reclaim and use the shallows lying beyond, so that neither he as owner of the shore land, nor his grantee of the shore land, may thereafter claim such rights as incident to such shore land; that this principle is applicable in a case where the owner of shore land platted it, together with the shallows beyond the shore, into town blocks and streets; and that if, after such platting, the owner had conveyed an inland block with reference to the platting, and the water had gradually encroached upon the land until the shore line reached that block, the riparian right to reclaim and use the platted blocks and streets in the water did not attach to the block thus conveyed as incident thereto. The court says, at page 215 of 47 Minn., page 681 of 49 N. W. (13 L. R. A. 411):

"As Rice might have conveyed the rights which he, as the owner of the shore land, had in the submerged land, so, and for the same reasons, he might have conveyed the land above low-water mark, and have reserved the rights naturally incident thereto in respect to the shallows lying beyond the shore; and the grantee, in a deed clearly importing an intention to limit the grant to the land above the shore line, would acquire only such land.

"The proposition thus stated and illustrated, that the owner of the shore land may legally disassociate therefrom and transfer to another, or reserve to himself, to be enjoyed independent of the shore land, his riparian right to reclaim and use the shallows lying beyond, so that neither he nor his grantee of the shore land may thereafter claim such rights as incident to their estate, is applicable to the facts of this case. When Rice conveyed block 108 (through which conveyance the plaintiff's title was derived), he had already made and recorded the plat embracing not only the dry land, but the shallows beyond. Block 110, the land here in controversy, was located partly within the shoal water beyond the shore, and still beyond that other blocks, with intervening streets, were platted. Rice, and no one else (subject to certain public rights which have not been, and probably never will be, asserted, and which do not affect the question before us), then had the exclusive right to appropriate the submerged lands to occupancy, improvement, and use in the manner indicated by the platting—that is, in separate or distinct parcels, as town blocks and streets—wholly independent of the future ownership or use of his shore land. No principle of policy or of law forbade him, as the owner of all this property and of these property rights, from thus doing, however it might result in adding to or impairing the natural advantages of the shore land, or that lying inland from the shore, all of which he owned. Subsequent purchasers from him of the shore land, or of the inland, purchasing with reference to the plat, might well be deemed to take their estates subject to the disadvantages as well as to the advantages resulting therefrom. He might thus restrict or limit the rights incident to his shore land or inland, so as to bind, not only himself, but his grantees. Yates v. Judd, 18 Wis. 118. It was said in Wilder v. City of St. Paul, 12 Minn. 192, 201 (Gil. 116): 'The purchaser of a lot according to such plan acquires a right to every advantage, privilege, and easement which the plan represents. His lot is made valuable by other streets, as well as the one on which it fronts. By the sale of a lot according to such plan there is an implied warranty that the purchaser shall enjoy all the privileges and benefits which it is calculated to secure, and by no private arrangement can he be deprived

of this.' And so it may be said that such a purchaser takes subject to whatever disadvantages may be involved in the platting. For instance, as against the purchaser of block 108, Rice, although he had remained the owner of the riparian block 110, would have been precluded by his platting and conveyance from afterwards appropriating the street platted in the shallow water beyond it to his private use, so as to prevent the improvement and use of it as a street. But the grantee of block 108, conveyed with reference to the plat, would also be precluded from denying to the grantor or to his assigns the right to occupy, improve, reclaim, and use the blocks platted in the shallow water, even though in the course of time the shore line should gradually move inland so as to reach this block 108, as has actually occurred. It was perfectly apparent from such a platting that Rice intended thereby to devote the platted blocks within the shallow water to disposal and use in separate parcels, and wholly independent of the ownership or use of the shore land; and when the plaintiff's grantor purchased and accepted a conveyance of block 108, although the deed was in the ordinary form and included the 'appurtenances thereunto belonging,' it must have been understood that no right or interest in the blocks located in the water passed thereby. Even if the block conveyed had been in fact situate on the shore, it could hardly have been supposed that it was intended that the deed should, in legal effect, include all the platted blocks lying beyond the shore; or that, notwithstanding the platting of the submerged lands, it was intended that, by the conveyance of the shore block alone, with its boundary lines on all sides precisely defined by means of the plat, the ordinary and unlimited rights of riparian ownership should pass with the deed, so that the grantee should acquire thereby the exclusive right to occupy, improve, and use for his own benefit all the platted blocks and streets lying beyond. If, under such circumstances, a conveyance of the block situate on the shore would have been deemed not to have been intended to transfer to the grantee the existing property rights in respect to the platted lands beyond the shore, then, for the same reason, the gradual retirement of the shore line, until the plaintiff's block has come to be on the water front, has been of no effect to vest in him any property rights in respect to such submerged blocks. The conveyance of a platted inland block was as much subject to the effect of the platting as a conveyance of a riparian block would be; and if in the latter case the ordinary riparian rights—that is, the exclusive right to occupy, improve, reclaim, and use the blocks lying in the water—would not pass, then, for the same reason, the gradual retirement of the shore line would not be incidentally attended with the consequence of vesting such rights in the plaintiff. He took his title subject to the existence of rights which, at least as between parties claiming under the common grantor and in accordance with the platting, had ceased to depend upon the location of the shore line, or to be affected or divested by the shifting of that line."

It is well to note that in this case the court has clearly declared that the riparian owner, and no one else, had the exclusive right (subject to certain public rights which had not been, and probably never would be, asserted, and which did not affect the question there, and do not affect the question in the case here at bar) to appropriate the submerged lands, out to the point of actual navigability, to occupancy, improvement, and use, in the manner indicated by the platting—that is, in separate or distinct parcels, as town blocks—wholly independent of the future ownership or use of his shore land, and that he might grant such right to another, as to any one or more of said distinct parcels, by a conveyance thereof according to the plat.

In Bradshaw v. Duluth Imperial Mill Co., 52 Minn. 59, 53 N. W. 1066, the trial court found that defendant was exclusively entitled to reclaim and occupy the submerged land in dispute and to an injunction enjoining plaintiff from asserting any claim thereto, and judgment

was entered accordingly. In the Supreme Court the judgment of the trial court was reversed, and the case remanded, with directions to enter judgment for the plaintiff. The Supreme Court, states the facts as follows:

"The only question presented by this appeal is whether the conclusions of law were justified by the findings of fact. These facts, so far as here material, are that one Orrin W. Rice, being the owner of a peninsula, the whole easterly side of which is washed by the waters of the Bay of Duluth, in December, 1858, executed and filed a town plat thereof under the name of 'Rice's Point.' This platting extended a long distance out into the waters of the bay, dividing it into blocks, streets, and avenues in conformity to the platting on dry land. Block 82, as shown on the plat, was the shore block. In front of this, and wholly in the water, there were platted some 19 blocks, one of which (139) included the lots in controversy. In February, 1859, Rice conveyed these lots, according to the recorded plat, to one Panzi, who subsequently conveyed to the plaintiff. The deed to Panzi was recorded in March, 1865.

"In March, 1873, pursuant to legislative authority, the city established a dock line coincident with the westerly side of Eighth street, as shown on the plat, and between these lots and the shore. In December, 1886, this dock line was, under legislative authority, changed to its present location, coincident with the westerly side of Eleventh street, and outside of the lots in suit. During the interval between March, 1873, and December, 1886, defendant's grantors, to whose rights they have succeeded, acquired title to the shore block 82, and to all of the water blocks in front of it, down to the old dock line on Eighth street. There are other findings as to a replatting of the land by Munger & Peck in 1888, and a conveyance by them to defendants, according to this replatting, of all the submerged blocks in front of the shore block out to the new dock line; but these facts are immaterial, for they could not affect plaintiff's title, derived through the prior conveyance from Rice to Panzi. Defendant must succeed, if at all, in its claim of title, by virtue of the conveyance to it of the shore block as including the riparian rights to all the submerged blocks out to the point of navigability as established by the new dock line, and this we understand to be the contention of defendant's counsel."

It is not necessary to fully quote from the opinion as I have done in Hanford v. St. Paul & Duluth R. Co., supra. It is sufficient to only call attention to certain doctrines which are clearly laid down therein. It adheres to and reaffirms the doctrines and principles laid down in Hanford v. St. Paul & Duluth R. Co., and Gilbert v. Eldridge, supra, and emphasizes and makes absolutely clear the holding of the court as to the respective rights or estate of the state and of riparian owners, in this state, in navigable waters and their beds. It again declares that the riparian owner may by his acts and evident intention disassociate his right from the shore land, and that he may convey a parcel of land under the water in front of his shore line, and by such conveyance confer upon his grantee the exclusive right to reclaim and occupy such submerged land, and thus cut off the right of his grantee of a parcel along the shore line to improve and reclaim out beyond the boundaries, as shown by the plat and the evident intention of the grantor, of the shore land conveyed. It further declares it to be the doctrine in this state that the right of a riparian owner to improve, reclaim, and occupy the submerged lands out to the point of navigability is not in the nature of a mere license or inchoate right, which, until exercised, the state may revoke at any time and grant the land under the water to a stranger, but that it is a vested property right which, though subor-

dinate to the public, right of navigation, cannot be taken away even by the state for a public use without compensation. Particular attention should be directed to its declaration that:

"The old common-law doctrine, or at least what has been generally assumed to be such, and which was adopted in some of the early American colonies, that the crown had a jus privatum, or right of private property, in navigable, waters and their shores, which it could alienate to a subject, has no place in the jurisprudence of this state. It is the settled law with us that the rights of the state in navigable waters and their beds are sovereign, and not proprietary, and are held in trust for the public as a highway, and are incapable of alienation."

Particular attention should also be directed to the fact that neither of the dock lines in this case were established until after the conveyance to the plaintiff of his submerged land, and that the first one was inside of his parcel, and the second outside of it, and to the declaration of the court that, while the private right in the soil under the water—the bed of the stream—is subordinate to the public right of navigation, and it is in the power of the state, as trustee for the public, to determine how far these waters are needed for purposes of navigation, and as such trustees to fix the line of navigability, beyond which it would not be permissible for the owner of the shore estate or his grantee to reclaim and occupy for private purposes, yet the establishment of a dock line neither creates nor destroys rights, but merely regulates and limits the exercise of existing rights; and that the rights of property of the riparian owner or his grantee in the soil under the water are not divested by either the location or change of location of the dock line; that so long as the old line remained in force, of course, he could not use the lots for any purpose inconsistent with the right of navigation in the water over them, but when the line was changed this limitation was removed, and the establishment of the new line was authority, as well as an invitation to him from the state, to fill in and build out to that line, or as far in that direction as his property extended. In other words, that while the establishment of the dock line invites the reclamation and improvement of a parcel of submerged land within it, and might thus create in its owner a vested right of occupancy and use which even the state could not afterwards appropriate or destroy, yet even the establishment of such dock line would not divest or take away the rights of a grantee from the riparian owner of a parcel of submerged land beyond such dock line, but would only be a limitation on its occupation and use, and in the nature of a warning that, if he should reclaim and occupy it, it might subsequently be removed, or otherwise dealt with, by the state, or by the general government, in the exercise of their right to preserve, protect, and improve the public rights of navigation.

Now, if all this be true as to the right or title of the riparian owner, suppose an island is made by the water and deposits therefrom on the bed of the stream in front of a riparian owner's shore and between it and the main navigable portion of the stream, or even between it and the middle thread of the stream, and especially where no dock line has been established, would not the riparian owner, or his grantee, have the right to the exclusive use and possession of such island as against all

parties other than the state or the general government, and even as against the state and the general government except in so far as it might become necessary or convenient for them, or either of them, acting by their properly constituted authorities, to exercise their paramount right for the purposes to which such paramount right extends, namely, to protect, preserve, and improve the public rights of navigation? And if the right and title of the state is only in its sovereign capacity, as trustee for the public, for the public uses of the water as such, and one which it cannot alienate, could the state unqualifiedly, and for no purpose connected with the preservation or improvement of the public right of navigation, convey such an island to a private party, and thus divest or deprive the riparian owner, or his grantee, of such right of exclusive use and possession? The answer to each of these questions would seem to be obvious.

It will be noticed that, in all the Rice's Point, or Duluth, cases which have been cited and quoted from above, the rules and principles there declared were with reference to the soil under the water of an arm or bay of Lake Superior, and it would seem that, if they apply to such waters and the soil under them (Lake Superior being, as has been so often decided by the Supreme Court of the United States and other state courts, a great inland sea, and as such to be considered the same as waters in which the tide ebbs and flows), they would *a fortiori* apply to inland streams and lakes.

The case of Lamprey and Wife v. State of Minnesota et al., 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541, was an action for the partition of real property in which the state was made a party under the statute. The complaint stated that plaintiffs owned ¹⁹/₃₀ of 300 acres of land, describing it, and that Metcalf, one of the defendants, owned the remaining 1/₃₀ part, and it prayed a partition between them. The complaint further stated that the state of Minnesota claimed some estate or interest in the land adverse to the title of plaintiff, but that the claim was unfounded and void. It also prayed judgment that the state had not title to or interest in the land. The summons and complaint were served upon the Attorney General, and in due time the Governor answered on behalf of the state, claiming that the locus in quo was, in the year 1853, a natural lake, and the title in the federal government; that the surrounding shore was surveyed and the lake meandered in September, 1853, under the direction and supervision of the Secretary of the Interior; that by the act of February 26, 1857, authorizing a state government, the lake was made a common highway forever, free to all citizens, and the title vested in this state; and that it has since continued therein.

The facts of the case, as stated by the court, were as follows: In 1853, at the time of making the United States survey of sections 4, 5, 8, and 9, township 28, range 22, there was in the center of these four sections a shallow, *nonnavigable* (?), lake, comprising about 300 acres, which the government surveyor meandered, in accordance with the rules and instructions of the department, "to meander all lakes and deep ponds of the area of 25 acres and upwards," and in doing so ran the meander lines substantially along the margin of the lake. The lake

and the meanders thereof appear on the official plat of the survey, and were referred to in the field notes. By this survey the lands bordering on the lake were subdivided into fractional governmental subdivisions and lots; the lake forming the boundary thereof on one side. The survey and plat were approved by the Secretary of the Interior in 1854. Subsequently, and prior to 1856, the United States, by patents, conveyed, without reservation or restriction, to various parties, all of these lands, which were described in the patents by their governmental subdivision or lot, according to the plat and survey, which were referred to in, and made part of, the patents. By sundry mesne conveyances from the patentees, the plaintiffs and defendant Metcalf had become the owners of all these riparian lands. Since the survey in 1853 the lake has been, through natural causes, gradually and imperceptibly drying up, until at the time of the commencement of the action the former bed had all become dry land. In 1860, after the lake had partially dried up, the United States Land Department caused a survey to be made of the land constituting that part of the former bed of the lake situated between the original meander line and the then existing margin of the lake, and in 1873 assumed to issue a patent therefor to one Gilmore, who subsequently conveyed to plaintiffs and Metcalf, who asserted title to the former bed of the lake both as grantees of the riparian lands according to the original survey of 1853, and also, in part, under the Gilmore patent. The state, on the other hand, claimed that the Gilmore patent was void, and that the patents, according to the original United States survey, only conveyed the land to the margin of the lake, as it thus existed, and that the former bed of the lake belonged to the state in its sovereign capacity. In the pleadings the state also asserted title under the swamp land grant from the United States; but this claim was abandoned on the trial, and, as the court said, very properly so, because, for manifest reasons, it was entirely untenable.

After stating the facts as above, the court goes on to say, at page 191 of 52 Minn., page 1140 of 53 N. W. (18 L. R. A. 670, 38 Am. St. Rep. 541):

"It will thus be seen that the question presented is: What rights in or to the soil under water does the patentee of land bounded by a meandered inland lake acquire by his patent?"

Then, after calling attention to the importance of the question both to the public and to riparian owners, and stating that the question ought to be approached and considered from a practical as well as legal standpoint, and that as the common law is a body of principles, and not mere arbitrary rules, the effort should be to apply the spirit and reason of those principles to the state of facts presented, the court says:

"There are certain matters which are so well settled that they may be summarily disposed of at the outset. Without troubling ourselves to consider what were the rights of the United States in these waters before they conveyed the lands bordering on them, it is well settled that, having disposed of lands bordering on a meandered lake by patent, without reservation or restriction, they have nothing left to convey, and consequently the land department was thereafter without jurisdiction, and the Gilmore patent, issued in

1873, was inoperative and void; also, that a meander line is not a boundary, but that the water whose body is meandered is the true boundary, whether the meander line in fact coincides with the shore or not; also, that grants by the United States of its public lands bounded on streams or other waters, made without reservation or restriction, are to be construed according to the law of the state in which the lands lie; and, consequently, whether the land forming the beds of these lakes belongs to the state, or to the owners of the riparian lands, is a question to be determined entirely by the laws of Minnesota. In support of these propositions, we need only cite Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838 [35 L. Ed. 428], and Mitchell v. Smale, 140 U. S. 406, 11 Sup. Ct. 819, 840 [35 L. Ed. 442].

"In St. Paul, S. & T. F. R. Co. v. St. Paul & P. R. Co., 26 Minn. 31, 49 N. W. 303, this court was led, from certain dicta in Railroad Co. v. Schurmeier, 7 Wall. 272 [19 L. Ed. 74], to suppose that the Supreme Court of the United States meant to hold otherwise as to patents of public lands bordering on navigable streams; but that no such doctrine has been adopted by that court is evident from Barney v. Keokuk, 94 U. S. 324 [24 L. Ed. 224], and subsequent cases."

It will be seen, from the last paragraph of the quotation above cited, that the court here finally, as indeed it had already begun to do in Hanford v. St. Paul & Duluth R. Co. and the other similar cases, shakes off and abandons the error hereinbefore referred to into which it had fallen in St. P., S. & T. F. R. Co. v. First Division of St. Paul & Pac. Ry. Co. et al., 26 Minn. 31, 49 N. W. 303.

The court then, after considering various decisions of other states, wherein a distinction is made between the title and rights of riparian owners in lands on running streams and on bodies of still water such as inland lakes, goes on to say:

"Our conclusion therefore is that upon both principle and authority, as well as considerations of public policy, the common law is that the same rules as to riparian rights which apply to streams apply also to lakes, or other bodies of still water.

"In this state we have adopted the common law on the subject of waters, with certain modifications, suited to the difference in conditions between this country and England, the principal of which are that navigability in fact, and not the ebb and flow of the tide, is the test of navigability, and that we have repudiated the doctrine that the state has any private or proprietary right (as had the king) in navigable waters, but that it holds them in its sovereign capacity, as trustee for the people, for public use.

"In accordance with the rules of the common law, we therefore hold: That, where a meandered lake is nonnavigable in fact, the patentee of land bordering on it takes to the middle of the lake; that, where the lake is navigable in fact, its waters and bed belong to the state, in its sovereign capacity; and that the riparian patentee takes the fee only to the water's edge, but with all the rights incident to riparian ownership on navigable waters, including the right to accretions or relictions formed or produced in front of his land by the action or recession of the water. Of course, it is a familiar principle that these riparian rights rest upon title to the bank or shore, and not upon title to the soil under the water."

Of course, this last sentence should be read and construed in view of what is said in Hanford v. St. P. & D. R. Co. and Bradshaw v. Duluth Imperial Mill Co., supra.

The court then goes on further to say, as to the definition or test of "navigability," as follows:

"What has been already said is sufficient for the purposes of the present case; but, to avoid misconception, it is proper to consider what is the definition or test of 'navigability,' as applied to our inland lakes. The division of

174 F.—30

waters into navigable and nonnavigable is but a way of dividing them into public and private waters, a classification which, in some form, every civilized nation has recognized; the line of division being largely determined by its conditions and habits.

"In early times, about the only use—except, perhaps, fishing—to which the people of England had occasion to put public waters, and about the only use to which such waters were adapted, was navigation, and the only waters suited to that purpose were those in which the tide ebbed and flowed. Hence the common law very naturally divided waters into navigable and nonnavigable, and made the ebb and flow of the tide the test of navigability. In this country, while still retaining the common-law classification of navigable and nonnavigable, we have, in view of changed conditions, rejected its test of navigability, and adopted in its place that of navigability in fact; and, still adhering to navigability as the criterion whether waters are public or private, yet we have extended the meaning of that term so as to declare all waters public highways which afford a channel for any useful commerce, including small streams, merely floatable for logs, at certain seasons of the year. Most of the definitions of 'navigability' in the decided cases, while perhaps conceding that the size of the boats or vessels is not important, and, indeed, that it is not necessary that navigation should be by boats at all, yet seem to convey the idea that the water must be capable of some commerce of pecuniary value, as distinguished from boating for mere pleasure. But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. Certainly, we do not see why boating or sailing for pleasure should not be considered, as well as boating for mere pecuniary profit.

"Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used—and as population increases, and towns and cities are built up in their vicinity, will be still more used—by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic use, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated. When the colony of Massachusetts, 250 years ago, reserved to public use her 'great ponds,' probably only fishing and fowling were in mind; but, as is said in one case, 'with the growth of the community, and its progress in the arts, these public reservations, at first set apart with reference to certain special uses only, became capable of many others, which are within the design and intent of the original appropriation. The devotion to public use is sufficiently broad to include them all, as they arise. West Roxbury v. Stoddard, 7 Allen [Mass.] 158.

"If the term 'navigable' is not capable of a sufficiently extended meaning to preserve and protect the rights of the people to all beneficial public uses of these inland lakes, to which they are capable of being put, we are not prepared to say that it would not be justifiable, within the principles of the common law, to discard the old nomenclature, and adopt the classification of public waters and private waters. But, however that may be, we are satisfied that, so long as these lakes are capable of use for boating, even for pleasure, they are navigable, within the reason and spirit of the common-law rule. When the waters of any of them have so far receded or dried up as to be no longer capable of any beneficial use by the public, they are no longer public waters, and their former beds, under the principles already announced, would become the private property of the riparian owners."

It will be noticed that I have italicized and put a question mark after the term "nonnavigable" used by the court in its statement of facts in reference to this lake. I have done this because it is very difficult, indeed quite impossible, for me to understand how, in view of what Judge Mitchell has said in the part of the opinion last above

quoted by way of explanation and definition of the term "navigable," any meandered lake could be nonnavigable in fact; for, certainly, if it were a lake at all, it would be capable of use for boating for pleasure, or for fowling, or for cutting ice, or for skating. This part of the opinion, it seems to me, should therefore be regarded as a mere dictum, and for a proper definition of the term "navigable" or "navigability" we should refer to the case of Union Depot Co. v. Brunswick et al., supra. But, however that may be, this was a case of reliction or recession of the waters, and it is only valuable here because of its general declaration that the common law on the subject of waters is the law of this state, with certain modifications, suited to the difference in conditions between this country and England, the principal of which is that navigability in fact, and not the ebb and flow of the tide, is the test of navigability, and that we have repudiated the doctrine that the state has any private or proprietary right (as had the king) in navigable waters, or their beds, but that it holds them in its sovereign capacity, as trustee for the people, for public use; and because it declares that under the common law the same rules as to riparian rights which apply to streams apply also to lakes, or other bodies of still water; and because it declares that, where a meandered lake is nonnavigable in fact, the patentee of land bordering on it takes to the middle of the lake, but, where the lake is navigable in fact, its water and bed belong to the state, in its sovereign capacity, and the riparian patentee takes the fee only to the water's edge, but with all the rights incident to riparian ownership on navigable waters.

As there is nothing in the opinion indicating any intention to modify anything that was said in Hanford v. St. Paul & Duluth R. Co., or in Bradshaw v. Duluth Imp. Mill Co., or in Gilbert v. Eldridge, we should refer to those cases to ascertain what "the rights incident to riparian ownership on navigable waters" are, and, having done this, the only conclusion that we can draw is that, when the court says that the riparian patentee of land bordering on a navigable lake takes the fee only to the water's edge, it means only that he takes the absolute and unlimited title in fee to that line, and cannot mean that he has no title to the soil under water beyond that line.

In the case of Webber v. Axtell et al., 94 Minn. 375, 102 N. W. 915, 6 L. R. A. (N. S.) 194, the majority of the court, speaking by Lovely, Justice, say:

"Plaintiff in this action seeks to recover an island in one of the smaller lakes of Martin county, about 15 rods distant from four government lots, which he entered and patented under the homestead laws of the United States. The cause was tried to the court, who, upon findings of fact, held as a conclusion of law that plaintiff was entitled to judgment declaring him to be the owner of the land in suit, and ordered judgment in his favor. This appeal is from an order denying amended findings and for a new trial.

"We are of the opinion that this cause must be determined upon the facts as found by the court; but it is necessary to premise, before calling particular attention thereto, that the original survey of township 103, range 32 (Martin county), was made by the United States in 1857, that, partly located in this township is a small meandered body of water about 3½ miles in length and one-half or three-fourths of a mile in width, known as Fox Lake, on the northwest shore of which is located a tract of land surveyed and platted by

the government as lots 2, 3, 5, and 6, in section 31, town 103, range 32. About 15 rods from the shore of this lake, and opposite the government lots referred to, is the tract of land in controversy. In making the original survey it was marked on the plat and indicated in the field notes as an island containing two acres, with good timber of oak, ash, and hackberry; but no actual survey was at that time made of such island, nor was it designated in any way as a specific part of the public domain, nor was there any indication on the plat that it was reserved as a part thereof. In 1865 plaintiff settled upon and entered lots 2, 3, 5, and 6 as a homestead, and then claimed that this so-called island was a part thereof; and the evidence supports the view that he occupied it as such until the fall of 1885, when, upon the application of a third party, one McConville, the United States caused the alleged island to be surveyed, platted, and designated it as lot 10, then accepted McConville's entry. McConville made some improvements on the land, but did not continue his settlement, when, in 1887, one Rice made an entry to this tract under the homestead laws. February, 1873, a patent was issued to the plaintiff for lots 2, 3, 5, and 6, and in 1891 a patent was issued to Rice for lot 10, being the so-called island, which had by recession of the water grown in size considerably. The defendants claim under Rice's entry by purchase. During a considerable portion of the time after Rice made his entry, the so-called island was occupied either by him or his tenants, and the question of adverse possession was litigated by the defendants under this contention. The substantial basis of plaintiff's claim to the land in controversy, however, rests upon asserted rights accruing to him under his homestead entry of 1865. Defendants claim the island under Rice's entry and the patent issued to him in 1891. It is likewise insisted in defendant's behalf that, by the acts and representations of plaintiff himself, he is now estopped from asserting any interest therein.

"The material facts above stated we do not regard as open to dispute, but at the trial evidence was received to show that from the time plaintiff settled upon his homestead there was attached to the so-called island (lot 10) two sand bars which at ordinary stages of water permitted access to it by teams at certain periods of the year, and it was found by the court, when the suit was brought, that the shore where plaintiff's lots were situated was connected to such island in times of ordinary low water by this means, and in times of high water submerged. This was contested. The claim that defendants held under adverse possession was clearly a question of fact, and the court held, upon sufficient evidence to justify its findings in that respect, that it had not been established. The court also declined to hold, upon application for amended findings, that the plaintiff was estopped from asserting his title to the land in controversy.

"Had the trial court determined as a matter of fact that at the time of the patent to plaintiff either one of the sand bars referred to connected the island with the shore line of his lots, there could be no doubt but that it would be our duty to hold that the decision of this case would be controlled by Schurmeier v. St. Paul & Pacific R. Co., 10 Minn. 89 (Gil. 59), 88 Am. Dec. 59, wherein it was held that the water, instead of the meander line, must be regarded as the proper boundary of such tract. The decision of this case was sustained by the Supreme Court of the United States on writ of error (7 Wall. 272, 19 L. Ed. 74), where it was decided that the meander lines on fractional tracts adjacent to public waters are designated in the field notes, not as boundaries, but for the purpose of ascertaining the quantity of land in the fraction, and also that the riparian owners retain their rights to construct suitable landings, wharves, etc., for the convenience of commerce and navigation, to the same extent as such proprietors on navigable streams affected by the ebb and flow of the tide at common law. But counsel insists that the facts as found by the trial court indicate that it did not give decided or sufficient significance to the time when the sand bars appeared between the plaintiff's lots and the island, and that such bars should have been formed previous to the commencement of the suit, and have been existing when plaintiff received his patent, to bring plaintiff's rights within the benefit of the Schurmeier Case. Counsel argues that since the court did not find that

the sand bars existed before the suit was commenced, or before the subsequent survey and patent to Rice in 1891, therefore the patent to the latter could not cut off the rights of Rice or those claiming under him. The decision in the Schurmeier Case, both in the state and federal courts, impress us very strongly that it was the accepted view that the riparian rights of the first proprietor vested in him a contingent interest in all accretions and, relictions, which would necessarily involve the sand bars and adjacent island; for, if it be true that the right of the shore owner in a body of navigable water carries with it a dependent interest to accretion and relictions, which became established at the time of his patent, an attempt on the part of the government to interfere with such rights afterwards would be ineffectual to take from him such right or interest. See cases cited in Sage v. Rudnick, 91 Minn. 325, 98 N. W. 89, 100 N. W. 106.

"There has been much discussion as to the distinction between navigable and nonnavigable lakes, so called, which arises from the relative rights of the public and shore owners to use the waters therein; but if Fox Lake was a navigable body of water, as must be conceded, the shore owner became vested with a contingent interest in such accretions as might be added to his land. It would follow as an incident thereto, and become his property. If the island between the shore and the center of the lake when the patent was first issued was unsurveyed, without any expressed intention on the part of the government to treat it as a portion of its dominion, it would accrue to plaintiff. We are very clear that this rule has been laid down in the case of Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541, where the distinction between navigable and nonnavigable lakes is considered and defined, and where it was held that the shore owner of a navigable stream or body of water is entitled to the riparian right of accretions, even though larger than the parent estate, which is an incident to all riparian ownership, and that this rule rests upon the broad principle that, to preserve the fundamental riparian right, viz., access to the water, upon which all others depend, and which may constitute its principal value. This establishes the contingent interest to such accretions as would include the sand bars and appurtenant island in this case. The reasons for this view are fully considered and discussed in Lamprey v. State, supra, and, applying the rule there laid down to the fact that as to this small island, at the time of the government survey and patent to plaintiff, the government of the United States made no claim, but treated it as the bed of the lake, which belonged to the state, subject to the rights of riparian owners, it fully sustains the learned trial court in the conclusion that plaintiff's interest became vested at the time of his patent, and established his ownership thereto."

It would seem from the opinion of the court that the trial judge did not find as a fact that at the time of the patent to plaintiff, or before the subsequent survey and patent to Rice, either one of the sand bars referred to connected the island with the shore line of plaintiff's lots; but it would appear from the dissenting opinion of Judge Lewis that such was not the fact at the time of the second survey and patent to Rice, and that prior to that time there was a well-defined, open, and navigable portion of the lake between the shore and the island. It would seem, however, that the majority of the court attached no particular importance to this fact, but treated the island as an accretion or reliction and held that, inasmuch as the government of the United States at the time of the government survey and patent to plaintiff made no claim to the island, but treated it as the bed of the lake, which belonged to the state, subject to the rights of riparian owners, the riparian right of the shore owner vested in him at the time of his patent a contingent interest in such accretions and relictions as might be added to his land; that such con-

tingent interest would include the sand bars when formed, and, as they express it, the "appurtenant island"; and that it would follow as an incident thereto and become his property.

Thus the decision seems to rest upon the doctrine of accretion or reliction, and to hold that under that doctrine the riparian owner acquires under his patent to the shore land a contingent interest in and to an island in front of his land and between it and the middle of the lake, which, upon the occurrence of certain conditions, as for instance the recession of the waters or the formation of connecting sand bars, would make it become his absolute property. Why it was necessary to announce, and rest the case upon, this vague doctrine of a contingent interest, I am unable to understand, in view of the declaration by the court, which is in accordance with the former decisions to which I have referred, that:

"If the island between the shore and the center of the lake when the patent was first issued was unsurveyed, without any expressed intention on the part of the government to treat it as a portion of its dominion, it would accrue to the plaintiff."

And the further declaration that, applying the rule laid down in Lamprey v. State "to the fact that as to this small island, at the time of the government survey and patent to plaintiff, the government of the United States made no claim, but treated it as the bed of the lake, which belonged to the state, subject to the rights of riparian owners, it fully sustains the learned trial court in the conclusion that plaintiff's interest became vested at the time of his patent, and established his ownership thereto." This island was so small that the government surveyor, acting in absolute good faith, might, as he evidently did, treat it as what the Supreme Court of the United States has called a "negligible fraction," and there was nothing in the circumstances of the survey, as in Harding v. Minneapolis & Northern Ry. Co., 84 Fed. 287, 28 C. C. A. 419, or otherwise, to indicate that the government intended to make any reservation thereof, or to in any way treat it as a part of the public domain. Under these circumstances, the government could not, under the decisions cited, assert any dominion over it or any title thereto, except to assert and exercise in the case of interstate waters its paramount right to protect and improve the public right of navigation, and consequently not only would the patentee under the subsequent survey take nothing, but the island would accrue to the original patentee of the shore land. There may be some doubt under the Minnesota cases which I have cited as to the question whether or not the state, or the general government, might, without compensation to the riparian owner, take possession of, dig away, or otherwise deal with, such an island in a navigable stream or lake—that is, one already permanently there at the time of the survey—for the purpose of preserving, protecting, or improving navigation; but, however that may be, until such right is exercised by the state or federal government, the entire beneficial title and ownership of such island would be in the riparian proprietor, and no other person could have, or acquire, except from such riparian proprietor, any title or right thereto.

In Harding v. Minneapolis & Northern Ry. Co., supra, the court, speaking by Judge Thayer, says:

"The plaintiff lays claim to Boom Island on the ground that the failure of the government surveyors to disclose the island by the survey made prior to March 25, 1849, to which reference was made in the patent to Bottineau, estopped the United States, after the grant to Bottineau, from thereafter surveying the island or asserting a title thereto. The plaintiff claims: That the island, being undisclosed by the first survey, passed to Bottineau by virtue of his patent; that, by failing to plat the island, the government surveyors in effect declared that it was of no value, and of no more importance than an equivalent portion of the bed of the stream, and that the riparian proprietors on the east bank of the river are therefore entitled to claim such parts of the island as lie on their respective fronts, precisely as they might claim it if it was an accretion formed in front of their respective properties by the action of the currents of the river since the survey was made. It may be conceded to be the general rule that where a government survey along the banks of a navigable stream is made, and the banks of the stream are meandered, but the survey fails to disclose a small island contiguous to the shore, the riparian proprietor holding the adjacent shore land under a grant from the government is entitled to such land as appurtenant to the grant. This rule rests upon the ground that the failure to survey small islands contiguous to either shore is evidence of an intent on the part of the government to surrender all claim thereto in favor of the adjoining riparian proprietors. Railroad Co. v. Butler, 159 U. S. 87, 15 Sup. Ct. 991 [40 L. Ed. 85]; Butler v. Railroad Co., 85 Mich. 246, 48 N. W. 569 [24 Am. St. Rep. 84]; Middleton v. Pritchard, 3 Scam. [Ill.] 510, 520 [38 Am. Dec. 112]; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838 [35 L. Ed. 428]. But as the rule last mentioned for the construction of grants is founded upon the presumed intent of the government to relinquish its title to islands which are contiguous to the bank of a stream, and are not surveyed or platted, the rule in question ought not to be applied when the circumstances are such as to rebut that presumption. If, when the bank of a stream is surveyed and meandered, good reasons exist for not indicating on the survey the existence of an island contiguous to the shore, the mere failure to indicate it ought not to be given the effect of divesting the government of its title thereto. In the case at bar we think that reasons did exist when the first survey was made for not platting Boom Island, and that they are sufficient to overcome the presumption, which would otherwise arise from the survey, that the government intended to relinquish its title to the island. It has already been shown that the survey to which reference was made in the Bottineau patent was neither a complete survey of the river nor a complete survey of township 29 north, of range 24 west, because a considerable portion of the township was on the west bank of the river, in what was then Indian country. Furthermore, it will be observed, by reference to 'Exhibit E,' that four sections of the township, to wit, sections 14, 15, 22, and 23, cornered on the island about in the center thereof, two of which sections were in the fractional part of township 29, which was surveyed in the year 1853, after the Indian title thereto had been extinguished. When the survey of the township was completed, Boom Island was duly surveyed and platted, and shortly thereafter the land forming the island was exposed for sale, and was sold to Hirman Saunders, under whom the defendant claims. It is fair to infer from these facts that the surveyors who made the first survey of a fractional part of the township on the east bank of the river omitted Boom Island from the plat of that survey, because a part of the island lay in sections of the township which could not at that time be surveyed. It is most probable that they did not survey and plat the island, because they did not deem it expedient to do so until the residue of the township lying west of the river was surveyed and platted. In view of all the circumstances of the case, and in view of the fact that the government, as early as 1853, caused the island to be surveyed, it is most likely, we think, that the government surveyors omitted to note the location, contour, and area of the island on the first plat, for the reasons

last suggested, rather than for the reason that they deemed the island of no importance, and properly appurtenant to shore land which fronted the island.

"In further support of the view that the facts in the case do not warrant an inference that the government intended to relinquish its title to Boom Island when it made the first survey, it may be said that the evidence contained in this record fails to show that Bottineau, or any of those claiming under him, except the plaintiff, ever took possession of Boom Island as appurtenant to the grant, or asserted a title thereto under the patent of March 25, 1849. They appear to have recognized the government's right to survey the island as a part of the public domain subsequent to the date of that patent, as well as its right to sell the land to Saunders; for, so far as the evidence shows, they never took any steps, until the present suit was filed, to challenge the survey or patent, or to prevent a sale. The conduct of Bottineau, and those claiming under him, for more than 40 years, has been in the nature of an admission that the claim, made by the government in 1853, that Boom Island was still a part of the public domain, was a lawful claim. In this latter respect the case at bar differs essentially from the case of Railroad Co. v. Butler, supra, on which much reliance was placed on the argument by the plaintiff's counsel. In that case a survey of land on the river bank which failed, as in this case, to disclose an island contiguous to the shore, was made in 1831; and the land on the bank was entered by those under whom the plaintiffs claimed, in the following year (1832). In the year 1837 the opposite bank of the river was also surveyed, and certain islands in the river were disclosed and surveyed; but the one in dispute was not then surveyed or disclosed, and no survey of said island was made until 1855. When the government patented the island in controversy to a third party under the survey made in 1855, and the grantee filed his patent for record, the plaintiffs, opposite to whose land the island lay, immediately commenced a suit to cancel and annul the patent as a cloud upon their title. In that case there was no pretense that the riparian proprietors ever acquiesced in the claim made by the government that the island remained public property, notwithstanding the first survey, while in the case at bar the evidence indicates such acquiescence for at least 36 years; that is to say, since the island was patented to Saunders, on May 3, 1859.

"Without pursuing the subject at any great length, it is sufficient to say that, upon the state of facts disclosed by the evidence, we think the Circuit Court did right in instructing the jury, at the close of all the evidence, to return a verdict for the defendant company; and the judgment entered upon said verdict is therefore affirmed."

This case was decided upon its own peculiar facts. But the court declares that it may be conceded to be the general rule that where a government survey along the banks of a navigable stream is made, and the banks of the stream are meandered, but the survey fails to disclose a small island contiguous to the shore, the riparian proprietor holding the adjacent shore land under a grant from the government is entitled to such land as appurtenant to the grant. The court makes special reference to the case of Grand Rapids & Indiana Ry. Co. v. Butler, 159 U. S. 87, 15 Sup. Ct. 991, 40 L. Ed. 85, which was ruled by the decisions of the Supreme Court of Michigan, where it has always been the recognized rule that a grant of land bounded in the deed of conveyance by a stream, whether navigable in fact or not, carries title in fee to the land under the water to the middle thread of the stream, subject to the public easement, in the absence of an express reservation. It seems to have assumed that, but for the peculiar facts of the case, the rule would be the same in Minnesota; but it cannot be said that such was its decision, as it was not necessary to

the proper determination of the controversy, and the case was determined on other grounds, namely, that under its facts there was no presumption that the government intended, in omitting the island from the first survey, to relinquish its title thereto, in favor of those who should become the owners of the river frontage opposite to which the island was, but that, indeed, the facts showed quite the contrary, and that plaintiff had by his conduct acquiesced therein. I think, however, that no other deduction can be drawn from the Minnesota decisions which I have cited than that, where, in a government survey of a stream and the contiguous land, a small island is in good faith omitted, and there are no facts and circumstances indicating an intention on the part of the government to reserve the same as a part of the public domain, it passes to the patentee of the shore land opposite to which it lies on the same side of the thread of the stream, and this was evidently the view of the federal court in this case. There may be a doubt as to the patentee's title in such an island, that is, one existing at the time of the survey, being subject to the right of the state, or of the federal government where the stream can be used for purposes of interstate commerce, to exercise dominion over it, without compensation to the patentee or his grantee, for the purpose of preserving, protecting, and improving the navigation of the stream; but as to an island made, by reclamation either by the patentee or his grantee, or by the action of the currents of the river, there can be no doubt but that the right to exercise such dominion does exist.

In Railroad Co. v. Butler, supra, the Supreme Court of the United States says:

"The inquiry is reduced then to this: Did the court err in holding as a matter of law, upon this record, that the grant vested in Lyon and Hastings the title to the particular land in controversy?

"In Hardin v. Jordan, 140 U. S. 371 [11 Sup. Ct. 808, 838, 35 L. Ed. 428], it was held that the grants by the United States of its public lands, bounded on streams and other waters, made without reservation or restriction, are to be construed as to their effect according to the law of the state in which the land lies, and the following from the opinion of Scates, J., in Middleton v. Pritchard, 3 Scam. [Ill.] 510, 520 [38 Am. Dec. 112], was quoted with approval: 'Where the government has not reserved any right or interest that might pass by the grant, nor done any act showing an intention of reservation, such as platting or surveying, we must construe its grant most favorably for the grantee, and that it intended all that might pass by it. What will pass, then, by a grant bounded by a stream of water? At common law, this depended upon the character of the stream, or water. If it were a navigable stream, or water, the riparian proprietor extended only to high-water mark. If it were a stream not navigable, the rights of the riparian owner extended to the center thread of the current. * * * At common law, only arms of the sea, and streams where the tide ebbs and flows, are deemed navigable. Streams above tide water, although navigable in fact at all times, or in freshets, were not deemed navigable in law. To these riparian proprietors bounded on or by the river could acquire exclusive ownership of the soil, water, and fishery, to the middle thread of the current, subject, however, to the public easement of navigation. And this latter, Chancellor Kent says, bears a perfect resemblance to public highways. The consequence of this doctrine is that all grants bounded upon a river not navigable by common law entitle the grantee to all islands lying between the mainland and the center thread of the current. And we feel bound so to construe grants by the government, according to the principles of the common law, unless the government has done some act to qualify or exclude the right. * * * The United States have not repealed

the common law as to the interpretation of their own grants, nor explained what interpretation or limitation should be given to, or imposed upon, the terms of the ordinary conveyances which they use, except in a few special instances; but these are left to the principles of law, and rules adopted by each local government, where the land may lie. We have adopted the common law, and must therefore apply its principles to the interpretation of their grant.'

"Hardin v. Jordan was a case from Illinois, and the question was as to the effect of the title granted by the United States along a small lake, in respect of the bed of the lake in front of the land actually described in the grant, and we said, page 380 [of 140 U. S., page 811 of 11 Sup. Ct. (35 L. Ed. 428)]: 'This question must be decided by some rule of law, and no rule of law can be resorted to for the purpose except the local law of the state of Illinois. If the boundary of the land granted had been a fresh-water river, there can be no doubt that the effect of the grant would have been such as is given to such grants by the law of the state, extending either to the margin or center of the stream, according to the rules of that law. It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted; no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines.' And see Packer v. Bird, 137 U. S. 661 [11 Sup. Ct. 210, 34 L. Ed. 819]; St. Louis v. Rutz, 138 U. S. 226 [11 Sup. Ct. 337, 34 L. Ed. 941]; Shively v. Bowlby, 152 U. S. 1 [14 Sup. Ct. 548, 38 L. Ed. 331].

"In Michigan the common law prevails, and the rule is sustained by an unbroken line of authorities that a grant of land bounded by a stream, whether navigable in fact or not, carries with it the bed of the stream to the center of the thread thereof. Norris v. Hill, 1 Mich. 202; Lorman v. Benson, 8 Mich. 18 [77 Am. Dec. 435]; Rice v. Ruddiman, 10 Mich. 125; Ryan v. Brown, 18 Mich. 196 [100 Am. Dec. 154]; Watson v. Peters, 26 Mich. 508; Pere Marquette Boom Co. v. Adams, 44 Mich. 403 [6 N. W. 857]; Fletcher v. Thunder Bay, etc., Co., 51 Mich. 277 [16 N. W. 645]; Turner v. Holland, 65 Mich. 453 [33 N. W. 283]; City of Grand Rapids v. Powers, 89 Mich. 94 [50 N. W. 661, 14 L. R. A. 498, 28 Am. St. Rep. 276]; and many other cases.

"In Mitchell v. Smale, 140 U. S. 406, 412, 413, 414 [11 Sup. Ct. 819, 840, 35 L. Ed. 442], a similar question to that disposed of in Hardin v. Jordan arose, and Mr. Justice Bradley, speaking for the court, said: 'We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be. It is nothing more nor less than taking from the first grantee a most valuable, and often the most valuable, part of his grant. Plenty of speculators will always be found, as such property increases in value, to enter it and deprive the proper owner of its enjoyment; and to place such persons in possession under a new survey and grant, and put the original grantee of the adjoining property to his action of ejectment and plenary proof of his own title, is a cause of vexatious litigation, which ought not to be created or sanctioned. * * * We do not mean to say that, in running a pretended meander line, the surveyor may not make a plain and obvious mistake, or be guilty of a palpable fraud; in which case the government would have the right to recall the survey, and have it corrected by the courts, or in some other way. Cases have happened in which, by mistake, the meander line described by a surveyor in the field notes of his survey did not approach the water line intended to be portrayed. Such mistakes, of course, do not bind the government. Nor do we mean to say that, in granting lands bordering on a nonnavigable lake or stream, the authorities might nor formerly, by express words, have limited the granted premises to the water's edge, and reserved the right to survey and grant out the lake or river bottom to other parties. But since the grant to the respective states of all swamp and overflowed lands therein, this cannot be done. In the present case it cannot be seriously contended that any palpable mistake was made, or that any fraud was committed by the surveyor who made the survey of 1834–35.'

"We have no doubt upon the evidence that the circumstances were such at the time of the survey as naturally induced the surveyor to decline to survey this particular spot as an island. There is nothing to indicate mistake or fraud, and the government has never taken any steps predicated on such a theory, and did not survey the so-called Island No. 5 until 25 years after the survey of 1831, and nearly 20 years after that of 1837."

The court here declares what the common-law doctrine is as to streams above tide water, although navigable in fact at all times, and in that connection quotes with approval, as it had already done in Hardin v. Jordan, from the opinion in Middleton v. Pritchard, which. after quoting the declaration of Chancellor Kent that the rule bears a perfect resemblance to the rule as to owners whose lands abut on public highways, says that:

"The consequence of this doctrine is that all grants bounded upon a river not navigable by common law entitle the grantee to all islands lying between the mainland and the center thread of the current."

Now, if the state of Minnesota has adopted the common law on this subject, except in so far as it must be modified by conditions in this country, as it certainly has (Lamprey v. State, supra), a riparian owner would be entitled to an island in the Mississippi river lying between his shore line and the center thread of the stream, which had not been surveyed, but had been treated by the government surveyor, without fraud or palpable mistake, as a negligible fraction; and would also be entitled to an island subsequently formed between his shore line and the center thread of the stream by gradual deposits made by the water and rising from the bed of the stream. In the latter case certainly, and in the former possibly, his title would be subject to the right of the state or general government, acting for the purpose of preserving, protecting, or improving the public right of navigation, to remove or otherwise appropriate said island without compensation to him.

I have thus gone over with great care the Minnesota decisions bearing upon the question here under consideration, and have quoted therefrom at length, perhaps at too great length, because it has seemed to me necessary to a full and clear understanding of them. From such examination I have been led inevitably to the conclusion that the following is the established rule or doctrine in this state: That where there is no reservation, express, or from the circumstances necessarily implied, in a grant of lands bounded by a stream navigable in fact, like the Mississippi river, the grantee takes the absolute title in fee to high-water mark, or at furthest to low-water mark. That the state has title to the soil or land under the water, between the edge of the stream and the middle thread thereof, in its sovereign capacity, in trust for the public, for the purpose of preserving, protecting, and improving the public right of navigation. That such right or title of the state is paramount for that purpose, but is not proprietary, or one under which it can alienate or convey any portion of said soil or land under water, or any island formed thereon, to a stranger, but is a limited title or ownership—limited to that purpose, and extending no further. That the riparian owner has also a right or title to such soil or land under water opposite his shore land, between the edge of the

stream and the middle thread thereof, which, though subject and subordinate to this title of the state, is proprietary, and exclusive as to all others than the state, or the general government, and even as to the state or general government exclusive except as they may act by their properly constituted authorities in protecting, preserving or improving said public right, and which he can convey to another either in whole or in part. That the limit to this private right is imposed by the public right, and by that only, and the private right exists up to the point beyond which it would be inconsistent with the public right, and with that only. That under this right or title the riparian owner, or his grantee, has the exclusive right to reclaim, occupy, and use, for any purpose not inconsistent with such public right, such soil or land under water, or any part thereof, out to the middle thread of the stream, or certainly to the main navigable channel thereof, subject only to such paramount right of the state, or of the general government. That under this right or title such riparian owner, or his grantee, has the exclusive right, subject only to such paramount right of the state or general government, to occupy and use, for any purpose not inconsistent with such public right, any island, or part thereof, between his shore line and the middle thread of the stream, whether such island exists at the time of the survey and is omitted therefrom in good faith and without palpable mistake, or is afterwards formed by the gradual action of the waters, and, as against all others than the state or the general government, acting under the paramount authority above referred to, he has the exclusive right to the possession thereof.

In other words, it seems to me that the Supreme Court of Minnesota has in effect, and for all practical purposes, finally adopted the common-law rule so clearly laid down by Judge Wilson in the Schurmeier Case; that is, of a qualified fee ownership in the riparian owner of the bed of the stream to the middle thread thereof—a rule just, simple, and easy of application. And I am fully persuaded from my consideration of its decisions that but for the error to which I have called attention, and of which it seems to have been difficult for the court to entirely divest itself, it would never have departed, or seemed to depart, therefrom. A careful examination of the cases will show that the same result would have been reached in each one of them, except the one which was subsequently overruled, by applying that rule; and, indeed, that under that rule the conclusion reached would have been obvious from a mere statement of the facts, and that thus the many long and sometimes seemingly inconsistent discussions, and the somewhat attenuated distinctions which have been attempted to be drawn, would have been avoided.

From the foregoing considerations, it necessarily follows that the plaintiff is entitled to the possession of the portion of the island here in question in front of her riparian premises, and judgment has therefore been ordered accordingly.